# ORIGINAL

1  **Burton V. McCullough, Esq. (CA SBN 41462)**
2  **4205 Encinas Drive**
   **La Cañada Flintridge, California 91011-3108**
3  **Telephone  (818) 952-5596**
   **Facsimile  (818) 952-5597**
4  **E-mail       lexchexrex@sbcglobal.net**

**FILED**

**MAY 19 2017**

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

5
6  **Attorney for** Jay W. Johnson, Debra F. Johnson, Jay Johnson A.I.A. and Associates, Inc.,
   Randal A. Johnson, Robin L. Johnson, JJ&A Architects, Inc., and Q Financial Group, LLC

7

8  ## UNITED STATES BANKRUPTCY COURT

9  ## CENTRAL DISTRICT OF CALIFORNIA

10 ## SANTA ANA DIVISION

11

12 | | |
| --- | --- |
| In re                                                    ) | CASE NO. SA 06-10373 ES |
|                                                          ) | (Chapter 7) |
| JAY  W.  JOHNSON  and  DEBRA  F. ) |  |
| JOHNSON,                                           ) |  |
|                                                          ) |  |
|                         Debtors.                   ) |  |
| ————————————————) |  |
|                                                          ) |  |
| JAY W. JOHNSON, DEBRA F. JOHNSON,) | Adversary No. |
| JAY JOHNSON A.I.A. AND ASSOCIATES,) |  |
| INC., RANDAL A. JOHNSON, ROBIN L.) |  |
| JOHNSON, JJ&A ARCHITECTS, INC., and) |  |
| Q FINANCIAL GROUP, LLC,                    ) | **COMPLAINT FOR** |
|                                                          ) | **WRONGFUL USE OF** |
|                         Plaintiffs,               ) | **CIVIL PROCEEDINGS** |
|                                                          ) | **(MALICIOUS PROSECUTION)** |
|                   vs.                                ) |  |
|                                                          ) |  |
| ROSENDO GONZALEZ, individually and as) |  |
| Trustee of the Bankruptcy Estate of Jay W.) |  |
| Johnson and Debra F. Johnson, JAMES A.) | **DEMAND FOR JURY TRIAL** |
| HINDS, Jr., HINDS & SHANKMAN, LLP,) |  |
| and RICHARD A. LAPIDES,                     ) |  |
|                                                          ) |  |
|                         Defendants.              ) |  |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.  JURISDICTION AND PARTIES .................................................................1

A. Jurisdiction...........................................................................................1

B. Plaintiffs, Defendants, and Richard Lapides's Character Traits and Pattern of
Behavior or Modus Operandi and Litigious Nature ...................................1

   1. Plaintiffs.........................................................................................1

   2. Defendants ....................................................................................2

   3. Lapides's Character Traits, Modus Operandi, and litigious nature ......2

     a. Lapides's character traits and modus operandi ..................................2

     b. Lapides's litigious nature ........................................................7

II.  THE    BANKRUPTCY    PROCEEDINGS,    LAPIDES'S    SUBSTANTIAL
INVOLVEMENT, AND MALICIOUS PROSECUTION ...........................................9

A. The Bankruptcy Proceedings.................................................................9

   1. The Bankruptcy Case ....................................................................9

   2. Gonzalez I......................................................................................9

   3. Gonzalez II ...................................................................................10

   4. Consolidation of Gonzalez I and II and Trial ....................................10

B. Lapides's Substantial Involvement in the Bankruptcy Proceedings .......11

C. Malicious Prosecution ........................................................................11

III. THE EVENTS LEADING TO BANKRUPTCY .............................................13

A. Early Events and the First Transaction between the Johnsons and Lapides ..........13

B. The La Forest Drive Properties ............................................................13

   1. The Lapides Property .....................................................................15

   2. The Johnson Property and the Lapides Option ..................................17

     a. The Johnson Property ...................................................................17

     b. The Lapides option .......................................................................18

   3. The property line dispute with the Coutins ......................................18

   4. The Yamashiro Property .................................................................19

i

5. The Johnsons's loss on the Lapides Property .......................................................... 19

C. Lapides's Threats Re: The Lack of Water on the Lapides Property ....................... 20

1. The offers to repurchase the Lapides Property .................................................. 21

2. The first efforts to obtain water on the Lapides Property .................................. 22

D. Lapides's Further Disputes with his Neighbors ...................................................... 22

E. The Canyon Meadows Property ............................................................................... 23

F. The Settlement Between the Johnsons and Lapides ................................................ 23

G. The Lawsuit on the 1993 Johnson Note and the Offer to Settle with the Johnsons and

the Coutins ............................................................................................................. 24

H. The 1994 Johnson Note and Amendment to the Lapides Option ............................. 26

1. The 1994 Johnson Note ...................................................................................... 26

2. The amendment to the Lapides Option .............................................................. 26

I. The Decision of the Court in the Lapides/Coutin Litigation and Richard and Janis

Lapides Engage in Fraudulent Conveyances ....................................................... 27

J. The 1994 Johnson Note and the Demise of the Johnson/Yamashiro Joint Venture 28

1. The 1994 Johnson Note ...................................................................................... 28

2. The demise of the Johnson/Yamashiro joint venture ........................................ 28

K. The Viro Road Property ........................................................................................... 30

L. The June 2000 Agreement ....................................................................................... 30

M. The Frame 10 Loan .................................................................................................. 33

N. The La Forest Drive Property .................................................................................. 33

IV. THE FILING OF BANKRUPTCY AND ITS AFTERMATH .................................... 34

A. The Filing of Bankruptcy ......................................................................................... 34

B. Lapides's Violation of the Automatic Stay ............................................................. 34

C. The Issue of Shareholder Loans to Jay Johnson ..................................................... 35

1. The error in the amount of the shareholder loans .............................................. 36

2. The meeting of creditors and the production of tax returns; Gonzalez's retention

of DesJardins. Fernandez & Smith: no objection to the Debtors's discharge ..... 36

ii

a.  The meeting of creditors and the production of tax returns ...........................36

(1) The first meeting of creditors ...................................................................36

(2) The Debtors produce the requested tax returns and Gonzalez and Lapides

discover the error ...................................................................................37

(3) The continued meeting of creditors ...........................................................38

b.  Gonzalez's retention of DesJardins, Fernandez & Smith...............................38

c.  Gonzalez has no objection to the Debtors's discharge ..................................39

D. Lapides's Grim Determination to have Gonzalez Sue the Johnsons ....................39

1.  Lapides's retention of Teresa A. Blasberg and the Motions to Conduct FRBP 2004

Examinations; the Motion to Extend Deadline; the Debtors's Motion for a

Protective Order; and the examination of Randy Johnson ..................................40

a.  Lapides's retention of Teresa A. Blasberg and the Motions to Conduct FRBP

2004 Examinations ........................................................................40

(1) Lapides's retention of Teresa A. Blasberg.....................................................40

(2) The Motions to Conduct FRBP 2004 Examinations .......................................40

b.  The Motion to Extend Deadline .................................................................41

c.  The Debtors's Motion for a Protective Order................................................42

d.  The examination of Randy Johnson ...........................................................42

2.  Lapides's and Gonzalez's retention of James A. Hinds, Jr. ...............................42

E.  Threats and Misrepresentations.......................................................................43

1.  Threats ...............................................................................................43

a.  The threat to make Randy Johnson's life "a living hell"...............................43

b.  Threats of criminal prosecution and financial ruination.................................44

2.  Misrepresentations....................................................................................45

a.  Misrepresentation re: discovery cutoff.......................................................45

b.  Misrepresentation re: temporary restraining order ......................................45

c.  Misrepresentation re: preliminary injunction ..............................................46

F.  Suborning Perjury, Intimidation of Witness, and Bribery .......................................46

iii

G. Mediation and the Motion to Compel Settlement ...................................................47

   1. The mediation ..................................................................................................47

   2. The preparation of the settlement agreement and the misrepresentations as to what was agreed ........................................................................................................47

   3. The motion to compel settlement ....................................................................49

H. The Threat of Criminal Proceedings and the Statement to Suppress or Destroy Evidence of Criminal Activity ..............................................................................50

I. Discovery, and the Defendants's Failed Attempt to Exclude Documents from Evidence ...............................................................................................................52

   1. The production of the documents and their designation as an exhibit for trial and Lapides's acknowledgement of having the documents and there being no objection to them ..............................................................................................52

   2. The first devious attempt to exclude the documents ........................................53

   3. The second devious attempt to exclude the documents ...................................54

   4. The third devious attempt to exclude the documents and Hinds's false statements 54

   5. Lapides adds his false testimony at trial.............................................................54

J. Gonzalez's False Testimony at Trial ......................................................................55

K. The Viro Road Property ........................................................................................56

   1. Jay Johnson finds the Viro Road Property and Randy Johnson agrees to buy the property and rent it to the Debtors.....................................................................56

   2. Randy and Robin buy the Viro Road Property and Jay and Debbie rent it from the seller pending the close of escrow .....................................................................57

     a. Jay and Debbie's financial standing in June 1995..........................................57

      (1) Jay and Debbie had no assets .................................................................57

      (2) Jay and Debbie had no credit..................................................................58

     b. Randy and Robin's financial standing in June 1995 .......................................59

     c. Randy and Robin sign the purchase agreement.............................................59

d.  Randy and Robin pay the $10,000 cash deposit .............................................60

e.  Randy and Robin's offer was a back-up offer .................................................60

f.  Mitchell accepts Randy and Robin's offer and Jay and Debbie rent the house pending the close of escrow...................................................................................60

g.  Randy and Robin pay the additional $55,250 deposit ....................................61

h.  Lapides's incompetence as an expert on the Viro Road Property transaction 61

3.  Randy retains JJ-AIA for architectural work.......................................................62

a.  The contract for architectural work ..............................................................62

b.  The plan checking fee ....................................................................................62

4.  Randy obtains a construction loan........................................................................63

a.  Preliminary steps to obtaining the loan .........................................................63

b.  The granting and selling of the loan ..............................................................64

5.  Completion of construction ..................................................................................65

6.  The Downey Savings Loan ...................................................................................65

7.  Randy pays the mortgage, etc. and Jay pays rent to Randy ................................66

a.  Rent from September 1996 to December 1996 ...............................................67

b.  Rent from January 1997 to April 1998 ..........................................................67

c.  Rent for 1998-2001 ........................................................................................68

d.  The alleged $10,000 fraudulent rent check issued by JJ&A ..........................68

8.  Lapides's bad faith claims regarding Jay's alleged payments for additional Viro Road Property expenses ........................................................................................71

a.  Bad faith claims regarding construction expenses .........................................71

b.  Bad faith claims regarding interior design services .......................................73

c.  Bad faith claims regarding pest control services ............................................73

9.  Randy Out-Spends Jay by a Considerable Amount .............................................74

L.  The Frame 10 Productions Loan ...................................................................................74

M. The La Forest Drive Property ........................................................................................75

1.  The purchase of the La Forest Drive Property ....................................................75

COMPLAINT

2. Profit or loss on the project ................................................................76

    a. Purchase costs incurred by Randy: $17,012.63 ................................76

    b. Development costs incurred by Randy: $6,815 ................................77

      (1) Development costs incurred by Randy paid by Q Financial: $4,835 ..........77

      (2) Development costs incurred by Randy advanced by JJ&A: $1,980 ...........77

    c. Mortgage payment costs incurred by Randy: $40,702.79 ................78

      (1) Interest on IndyMac Loan at time of purchase: $326.39 ..............78

      (2) Interest plus principal on IndyMac Loan incurred by Randy and paid by Q Financial: $40,376.40 ...................................................78

    d. Randy runs out of money by May 2001 ................................78

    e. The transfer of the La Forest Drive Property to JJ&A ..................78

    f. Mortgage payments incurred by JJ&A: $30,282.30 ....................80

    g. Interest paid IndyMac on sale of the La Forest Drive Property: $3,735.77; total interest paid IndyMac in 2001: $60,755.63 ....................................80

    h. Costs of sale of the La Forest Drive Property: $45,421.73; taxes paid: $4,411.10 80

      (1) Costs of sale: $45,421.73 ..........................................80

      (2) Taxes paid: $4,411.10 ..............................................80

    i. Loss on the La Forest Drive Property: ($89,558.80) ....................81

    j. Receipt of the proceeds of the sale of the La Forest Drive Property ..............81

N. JJ&A's Loan to Lawrence Gillins ........................................82

O. The Canyon Meadows Property ..........................................84

P. The Fallbrook Property ..................................................87

Q. Q Financial ............................................................88

R. Lapides Changed His Testimony Regarding the Conspirators and Other Subjects 90

    1. Lapides testified it was not his opinion that Debbie Johnson had conspired to hide assets ..................................................................90

2. Lapides testified at trial that he did not have an accusation against Robin Johnson for conspiring with the others ...................................................................91

3. Lapides testified he does not know whether Michael McFall is a conspirator ...92

4. Lapides testified he does not know whether Greg and Elaine Litster are conspirators ..................................................................................................92

5. Lapides testified he does not know whether Michael Milam is a conspirator ....93

6. Lapides testified he does not know whether Lawrence Gillins is a conspirator .93

The plaintiffs, Jay W. Johnson, Debra F. Johnson, Jay Johnson A.I.A. and Associates, Inc., Randal A. Johnson, Robin L. Johnson, JJ&A Architects, Inc., and Q Financial Group, LLC, complain and allege against Rosendo Gonzalez, individually and as Trustee of the Bankruptcy Estate of Jay W. Johnson and Debra F. Johnson, James A. Hinds, Jr., Hinds & Shankman, LLP, and Richard A. Lapides, the defendants, as follows:

**CLAIM FOR RELIEF**

**WRONGFUL USE OF CIVIL PROCEEDINGS**

**(MALICIOUS PROSECUTION)**

**I.    JURISDICTION AND PARTIES**

    **A.    Jurisdiction**

    1.    This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 151, 157, 1334, and 1367(a), 11 U.S.C. § 105, Federal Rules of Bankruptcy Procedure, Rule 7001, as well as the Local Bankruptcy Rules of the United States Bankruptcy Court and the Local Rules for the United States District Court for the Central District of California.

    **B.    Plaintiffs, Defendants, and Richard Lapides's Character Traits and Pattern of Behavior or *Modus Operandi* and Litigious Nature**

        **1.    Plaintiffs**

    2.    Jay W. Johnson and Debra (Debbie) F. Johnson are husband and wife. For ease of reference and to avoid stilted and cumbersome dialogue, Jay and Debbie Johnson are sometimes referred to simply as "Jay" and "Debbie."

    3.    Jay Johnson A.I.A. and Associates, Inc. ("JJ-AIA"), is a California corporation owned by Jay Johnson.

    4.    Randal (Randy) A. Johnson and Robin L. Johnson are husband and wife. Randy Johnson is Jay Johnson's brother. For ease of reference and to avoid stilted and cumbersome dialogue, Randy and Robin Johnson are sometimes referred to simply as "Randy" and "Robin."

1

5.      JJ&A Architects, Inc. ("JJ&A"), is a California corporation owned by Randy Johnson. Q Financial Group, LLC ("Q Financial"), is a California limited liability company owned by Randy and Robin Johnson.

**2.      Defendants**

6.      Rosendo Gonzalez ("Gonzalez") is a lawyer licensed to practice law in the state of California and a Chapter 7 Trustee.

7.      James A. Hinds, Jr. ("Hinds"), is a lawyer licensed to practice law in the state of California, formerly the managing member of the Law Offices of James A. Hinds, Jr., and subsequently the managing partner of Hinds & Shankman, LLP ("H&S"), a California limited liability partnership.

8.      Richard A. Lapides ("Lapides") and Janis T. Lapides, whose maiden name is Janis Thornley (and not a named defendant), are husband and wife and were married August 6, 1993. At all times alleged herein Lapides was employed as an appraiser for the Internal Revenue Service ("IRS").

**3.      Lapides's Character Traits, *Modus Operandi*, and litigious nature**

**a.      Lapides's character traits and *modus operandi***

9.      Lapides has a pattern of behavior or *modus operandi* he follows to take advantage of others for his own purposes. The Johnsons and Lapides are members of The Church of Jesus Christ of Latter-day Saints ("LDS Church"), and Lapides used his friendship and church association with Jay and Debbie Johnson to gain their trust and take advantage of their forbearing and charitable natures to cheat them and enrich himself at their expense. Lapides also preyed upon other members of the LDS Church who assumed he was honest in his dealings with them; but once they became involved with Lapides, he turned on them and falsely accused them of not fulfilling their obligations as an excuse for his own dereliction in not paying what he owed them or not keeping his own commitments. Lapides followed a similar pattern with tradesmen and professionals who provided him with goods and services. Lapides engaged in combative behavior to intimidate others into either taking less than they were owed or paying him more than he was entitled to be paid.

2

Lapides engaged in bullying, cajoling, arguing, lying, and making threats to report supposed crimes to criminal authorities and the IRS until his victims paid him what he wanted or gave up what they were entitled to have. The following examples demonstrate Lapides's pattern of behavior or *modus operandi* and illustrate the traits of his character which evidence his eventual hatred and animosity toward the Johnsons:

a.    For many years, Lapides rented rooms in his house to others. One of his renters was Brian Gunn. Lapides and Gunn got into a dispute, and Lapides reported the matter to the Los Angeles County Sheriff's Office, accusing Gunn of slashing the tires on his car. On May 30, 1990, Gunn filed a civil action against Lapides. Another renter was Steve Biggs who rented a room from Lapides from 1990 to 1992, and when he left, Lapides refused to return to him his $400 deposit, insisting Biggs was not entitled to the deposit.

b.    Lapides hired George Brazil Plumbing Heating Air Conditioning to do work at his home. When the work was completed, Lapides complained and argued the job had not been done properly and refused to pay for the work. When the dispute became heated, the plumber called the Los Angeles County Sheriff, and Lapides was led away in handcuffs by two deputy sheriffs.

c.    Lapides hired Jesus Hernandez, a gardener, to trim the trees on his property, and when Hernandez asked for payment, Lapides complained and argued the job had not been done properly and refused to pay him.

d.    Lapides hired an electrician to do work at his home, and Lapides again complained and argued the job had not been done properly and refused to pay the full amount charged.

e.    Lapides hired Itsvan Batori, a cabinet maker, to do work for him, and when Batari asked for payment, Lapides complained and argued the job had not been done properly and refused to pay him. On September 26, 2002, Lapides filed a small claims action against Istvan. On October 29, 2002, Istvan filed a counterclaim against Lapides for unpaid wages. On March 11, 2003, judgment was entered in favor of Istvan and against Lapides in the amount of $2,325 for unpaid wages, plus costs.

3

f.     Lapides hired Robert Frame, a member of the LDS Church, to remove tree stumps and do grading on his property, and then argued with Frame over the work and never paid him for his services.

g.     Dan Dodge was a contractor and member of the LDS Church. In about December 1996, Dodge contracted with Lapides to add a family room to his house. Lapides provided Dodge drawings or plans from which to build. The project went well except for a few items Dodge agreed to do that were not in the plans and which he did without changing his price. As the project came to an end Lapides began to find issues with the last few items. For example, the roof was called out to tie into the existing roof without removing the many layers of existing roof material. Also, there was no gutter system called out on the plans. Lapides also wanted built-in shelves in the new closet that was not a part of the contract. Dodge had his roofer build up the new roof section to match the old from the connection point out two to three feet and then taper back to the single layer of roofing on the new addition. Lapides would not accept this work even after Dodge had the roof manufacturer meet on site and verify the installation. Dodge finally agreed to put on a gutter system to pacify Lapides's "unhappiness" about the roof.

After putting the gutter system in place Lapides requested Dodge provide shelving in the closet that was not on the plans, and that Dodge do it at no cost to Lapides. Lapides stated he was not going to pay Dodge the balance of the contract, and stated that Dodge was contracting without a license. Lapides owed Dodge approximately $10,000, not including the shelving or the other extra items Dodge did that were not part of the contract. Lapides also demanded that Dodge pay him back all the money Lapides had paid to that point, and threatened that if Dodge did not pay him, he would sue Dodge.

Dodge's license had lapsed because his brother, who was his business partner, had not paid the renewal fee. Dodge called the California Contractor's State Licensing Board and paid the fee. The Board immediately reactivated Dodge's license. Lapides stated to Dodge he knew the license was inactive when he contracted with Dodge but did so because he knew he could get the job for less money or for free by using that against Dodge.

4

1  Lapides went further by inviting Dodge into his office where Lapides showed him a three-
2  drawer filing cabinet Lapides said was filled with lawsuits. Lapides opened the drawers,
3  one by one, and drew his finger across the tops of the folders and said: "All these people
4  have lost and have had to pay me." Lapides showed Dodge another filing cabinet filled
5  with files and stated that all those files were pending cases he was going to win also.

6      Michael Bayard, a lawyer and member of the LDS Church who specialized in
7  construction law and a friend to Dodge, told Lapides that while Dodge could not force
8  Lapides to pay him the balance owing because his license had lapsed, Lapides could not
9  force Dodge to give back the money Dodge had been paid. Lapides never paid Dodge what
10  he was owed.

11      At the trial which is the subject of this action, Lapides was shown a copy of a
12  supposed contract on letterhead dated December 16, 1996 reading "Dodge Construction
13  Company" which Lapides testified was signed by both he and Dodge. Lapides was also
14  shown a copy of a supposed second agreement Lapides testified was signed by both he
15  and Dodge dated April 21, 1997. Lapides denied he prepared the first contract with the
16  letterhead "Dodge Construction Company," and testified it was given to him by Dodge
17  and Lapides signed it. Lapides testified he prepared the second agreement dated April 21,
18  1997, that he signed it and then Dodge signed it in his presence. Also produced at trial was
19  a declaration signed by Dodge, and it was obvious the signatures on the contracts Lapides
20  testified Dodge signed, did not match Dodge's genuine signature on the declaration.
21  Dodge testified he never had stationary like the supposed contract on the letterhead reading
22  "Dodge Construction Company," he had never seen the two documents before counsel for
23  the Johnsons showed them to him, and he did not sign them.

24      h.    Dean Snyder Construction performed work for Lapides at his house and
25  when the work was done a dispute arose regarding payment for the work. On March 14,
26  2001. Dean Snyder Construction filed a small claims action against Lapides.

27      i.    David Luna was an attorney who represented Lapides in Lapides's failed
28  effort to avoid sanctions for violating the automatic stay immediately following the

bankruptcy filing by Jay and Debbie Johnson. Lapides then sued Luna in Los Angeles Superior Court.

j.    Lapides hired Mark Huchins, an architect, to draw up plans for a small house on his property, and when Lapides discovered he could not use the plans because he had not given Huchins correct information, he threatened Huchins with a lawsuit if Huchins did not refund the fee Lapides had paid. To avoid the stress of litigation, Huchins refunded the payment.

k.    Evelyn Callister, a divorced woman with eight children and member of the LDS Church, rented rooms in her home to the Church missionaries and others to earn money. Lapides persuaded Callister to rent a room temporarily to his mother. A few months later when Callister indicated she needed the room for her daughter when she returned from school, Lapides threatened to sue Callister for violating the Americans with Disabilities Act for allegedly discriminating against his mother because she was supposedly handicapped. Lapides threatened to take Callister's deposition and subpoena all her bank statements and deposit records, tenant records, and federal income tax returns, and threatened to report her to the IRS. Lapides accused Callister of putting his mother in a life-threatening position, and threatened to sue her if anything untoward happened to his mother. Lapides further threatened to sue Callister and take away her house to pay for a judgment, telling her that his attorney had assured him he had a seventy-five percent chance of winning a planned $300,000 lawsuit; and just for good measure Lapides told Callister to "show a little Christian compassion." Lapides finally said he would settle for $2500, which included $500 for moving expenses to move his mother. The demand was paid by several members of the LDS Church, and Lapides then asked the elders in the Church to move his mother for free and pocketed the extra money.

l.    During the installation of sewers in the City of La Cañada Flintridge, Lapides refused permission to lay the sewers under the road leading to his house, forcing the City to file an action for eminent domain/condemnation on October 24, 2006.

6

1        m.      Gonzalez brought an ill-conceived motion to enforce a supposed settlement

2  between the parties in the bankruptcy proceedings. The court erroneously granted the

3  motion and Jay and Debbie had to pay the $138,000 portion of the settlement then due

4  pursuant to the supposed agreement. After the bankruptcy court reconsidered and reversed

5  the decision, Lapides refused to refund the money he had received and the Johnsons were

6  forced to obtain an order from the court forcing Lapides to repay the money.

7        n.      On September 2, 2008, Lapides filed suit against his sister, Mona Lapides,

8  seeking a restraining order regarding domestic violence which was denied. On March 23,

9  2009, Lapides again filed suit against his sister, Mona Lapides, seeking a restraining order

10  regarding domestic violence which was granted.

11        o.      On June 24, 2010, Design Forward LLC filed a small claims action against

12  Lapides for unpaid fees owed for architectural work. On August 3, 2010, Lapides filed a

13  counterclaim for damages. Lapides's claim was denied and judgment was entered in favor

14  of Design Forward LLC in the amount of $3,600, plus costs.

15                        **b.      Lapides's litigious nature**

16        10.     Lapides is an extremely litigious person, threatening to sue everyone with

17  whom he has a dispute, whether real or concocted, to force them to capitulate to his

18  demands. Lapides initiated lawsuits against others or was sued by others in over twenty

19  different actions. The disputes between Lapides and the Johnsons spanned almost thirty

20  years, and for half that time Lapides embroiled the Johnsons in unfounded and malicious

21  litigation. In addition to the cases identified later in this complaint, Lapides was involved

22  in the following litigation demonstrating his pattern of behavior and litigious nature and

23  evidence of his instigating unwarranted litigation against the Johnsons to coerce or

24  pressure them to accede to his wishes:

25        a.      July 14, 1982, *Jesse Duran and Jose Duran v. Richard Lapides*, Los Angeles

26  Superior Court, Case No. NWC 87541.

27        b.      May 30, 1990, *Brian Gunn v. Richard Lapides*, Los Angeles Superior Court,

28  Case No. ES 50 (Burbank-Glendale).

1   c.  July 10, 1990, *Richard Lapides v. Elias Coutin, et al.*, Los Angeles Superior

2 Court, Case No. EC 831 (Burbank-Glendale).

3   d.  September 5, 1990, *The Elias Coutin & Anne Coutin Family Trust v. Richard*

4 *Lapides*, Los Angeles Superior Court, Case No. BC 009767.

5   e.  August 24, 1993, *Edward Fong v. Richard Lapides*, Los Angeles Superior

6 Court, Case No. 93K31521.

7   f.  November 9, 1993, *Richard Lapides v. Jay Johnson and Debbie Johnson*,

8 Los Angeles Superior Court, Case No. EC013523.

9   g.  December 5, 1994, *Hunt, Ortmann, Blasco, Pallfy, Rossell v. Richard*

10 *Lapides*, Los Angeles Superior Court, Case No. GC013673.

11   h.  June 21, 1995, *Hunt, Ortmann, Blasco, Pallfy, Rossell v. Richard Lapides*,

12 Los Angeles Superior Court, Case No. 95C02060.

13   i.  March 23, 1999, *Richard Lapides v. Citicorp Mortgage, Inc.*, Small Claims,

14 Glendale, Case No. 99S00539.

15   j.  March 14, 2001, *Dean Snyder Construction v. Richard Lapides*, Small

16 Claims, Glendale, Case No. 01S00376,

17   k.  May 10, 2002, *Richard Lapides v. David Luna*, Los Angeles Superior Court,

18 Case No. 02K09081.

19   l.  September 26, 2002, *Richard Lapides v. Istvan Batori*, Small Claims,

20 Glendale, Case No. 02SG1803.

21   m.  January 29, 2004, *Shayna Lapides v. Richard Lapides, et al.*, Orange County

22 Superior Court, Case No. 04CC00334.

23   n.  October 1, 2004, *Jay Johnson, et al., v. Richard Lapides, et al.*, USBC, Adv.

24 No. AD04-02572 ES.

25   o.  October 24, 2006, *City of La Cañada Flintridge v. Richard Lapides, et al.*,

26 Los Angeles Superior Court, Case No. BC360766.

27   o.  March 2, 2007, *Randal A. Johnson, et al., v. Richard Lapides, et al.*, Los

28 Angeles Superior Court, Case No. BC367211.

q.    February 1, 2008, *Jay Johnson v. Rosendo Gonzalez, Richard Lapides*, Los Angeles Superior Court, Case No. BC384860.

r.    September 2, 2008, *Richard Lapides v. Mona Lapides*, Los Angeles Superior Court, Case No. EQ005241.

s.    March 23, 2009, *Richard Lapides v. Mona Lapides*, Los Angeles Superior Court, Case No. EQ006141.

t.    June 24, 2010, *Design Forward LLC v. Richard Lapides*, Small Claims, Glendale, Case. No. 10SG1394.

u.    December 6, 2016, *Jay Johnson, et al. v. Richard Lapides*, Los Angeles Superior Court, Case No. BC642798.

## II.    THE BANKRUPTCY PROCEEDINGS, LAPIDES'S SUBSTANTIAL INVOLVEMENT, AND MALICIOUS PROSECUTION

### A.    The Bankruptcy Proceedings

#### 1.    The Bankruptcy Case

11.    On April 5, 2001 ("Petition Date"), Jay and Debbie Johnson (sometimes referred to as "Debtors") filed a voluntary petition under Chapter 7 of Title 11 of the United States Code ("Bankruptcy Petition"), Case No. LA 01-20244 ES, later renumbered SA 06-10373 ES ("Bankruptcy Case"), creating a bankruptcy estate ("Bankruptcy Estate"). The first meeting of creditors was held May 8, 2001, at which Gonzalez was elected the Chapter 7 Trustee. The Debtors filed their Schedules and Statement of Financial Affairs ("Bankruptcy Schedules") on April 20, 2001, as amended on July 26, 2001, and again on October 29, 2002, and received their Chapter 7 discharge ("Bankruptcy Discharge") on November 6, 2001.

#### 2.    Gonzalez I

12.    On June 2, 2003, at Lapides's instigation and urging, Gonzalez filed a complaint against Randy Johnson and JJ&A, Adversary No. LA 03-01851 ES, renumbered SA 06-01313 ES ("Gonzalez I"). The complaint was filed by Lapides's then attorney, Teresa A. Blasberg, designated in the caption as "Proposed Special Counsel for Rosendo

9

1    Gonzalez, Chapter 7 Trustee." On October 2, 2003, the Law Offices of James A. Hinds,

2    Jr., whom Lapides agreed to pay, was substituted in as counsel for Gonzalez.

3          13.    On November 26, 2003, JJ&A was dismissed with prejudice. The complaint

4    alleged claims to avoid fraudulent transfers pursuant to 11 U.S.C § 544 and Cal. Civ. Code

5    §§ 3439.04(a)(1) and 3439.07(a)(1) (first claim: transfers made with intent to hinder,

6    delay, or defraud creditors), 11 U.S.C § 544 and Cal. Civ. Code §§ 3439.05 and

7    3439.07(a)(1) (second claim: transfers for less than reasonably equivalent value while the

8    debtors were insolvent or which rendered the debtors insolvent), 11 U.S.C § 544 and Cal.

9    Civ. Code §§ 3439.04(a)(2)(A) and 3439.07(a)(1) (third claim: transfers for less than

10   reasonably equivalent value that rendered the debtors undercapitalized), and 11 U.S.C

11   § 544 and Cal. Civ. Code §§ 3439.04(a)(2)(B) and 3439.07(a)(1) (fourth claim: transfers

12   for less than reasonably equivalent value and the debtors intended to incur debts beyond

13   their ability to pay), to recover property or damages on account of avoided transfers

14   pursuant to 11 U.S.C § 550(a)(1) (fifth claim), to recover property or damages on account

15   of avoided transfers pursuant to 11 U.S.C § 550(a)(2) (sixth claim), for a constructive trust

16   (seventh claim), and for injunctive relief (eighth claim).

### 3.    Gonzalez II

18         14.    On September 22, 2004, again at Lapides's instigation and urging, Gonzalez,

19   represented by Hinds, whom Lapides agreed to pay, filed a complaint against the Debtors,

20   JJ-AIA, Randy and Robin Johnson, JJ&A, and Q Financial, Adversary No. LA 04-02540

21   ES, renumbered SA 06-1311 ES ("Gonzalez II"). The complaint alleged claims for

22   revocation of discharge pursuant to 11 U.S.C § 727(d)(2) and (e)(2)(B) (first claim),

23   turnover and accounting pursuant to 11 U.S.C § 542(a) and (e) (second claim), conversion

24   (third claim), and constructive trust (fourth claim).

### 4.    Consolidation of Gonzalez I and II and Trial

26         15.    By Order entered April 6, 2005 in Gonzalez II and Order entered April 11,

27   2005 in Gonzalez I, the court consolidated Gonzalez I and II. Trial was held over a three-

28   week period: February 24-28, April 22-25, and October 20-24, 2014. On February 24,

2016, the court ruled in favor of the Johnsons and their companies on all claims, and judgment was entered in favor of the Johnsons and their companies on May 20, 2016, from which there was no appeal, and the time to appeal has expired. At the end of trial the court found Gonzalez failed to prove any element of any of the claims.

### B.   Lapides's Substantial Involvement in the Bankruptcy Proceedings

16.   Lapides's interest in the outcome of Gonzalez I and II was significant and his participation in the cases extensive. Lapides was the only complaining creditor in the Bankruptcy Case and stood to gain financially if Gonzalez prevailed. Lapides retained Hinds to represent Gonzalez and funded the litigation in its entirety, and testified the first day of trial that he had paid Hinds between $200,000 and $300,000 and still owed him as much as $800,000. Hinds contends that after trial Lapides owes him $1,200,000.

17.   Lapides gathered and analyzed all the evidence in the cases, testifying he reviewed "hundreds of thousands" of documents, and spent over four thousand hours preparing his two-hundred-page report with thousands of exhibits to support the claims asserted in the adversary proceedings and his one hundred-eighty-page response to the thirty-one-page report prepared by Chad Turner, the expert for the Johnsons. Lapides participated in all phases of the litigation, appearing at court hearings and attending all depositions, and prepared and submitted dozens of declarations in motions brought or opposed by Gonzalez or in support of his own motions throughout the ten years of litigation. Lapides participated in the mediation of the cases and the unsuccessful attempt to enforce a settlement. Lapides, virtually the only witness to testify in behalf of Gonzalez, testified as both a percipient and an expert witness at trial and was on the stand for nine days. Except for Lapides there would have been no case at all—Lapides was the real party in interest in the litigation—Gonzalez was the plaintiff in name only.

### C.   Malicious Prosecution

18.   Lapides, Gonzalez, Hinds, and H&S (the "Defendants"), were actively involved in initiating or bringing and continuing Gonzalez I and II. Gonzalez I and II ended in favor of Jay Johnson, Debbie Johnson, JJ-AIA, Randy Johnson, Robin Johnson,

JJ&A, and Q Financial (the "Plaintiffs"). The claims asserted in Gonzalez I and II were based entirely on the so-called expert reports prepared by Lapides, and depended almost exclusively upon Lapides's testimony. An objective examination of Lapides's reports at any time would have shown without question that the Defendants lacked probable cause to initiate or continue Gonzalez I and II in that no reasonable person in the Defendants's circumstances would have believed there were reasonable grounds to bring the claims alleged against the Plaintiffs. The Plaintiffs obtained a rebuttal report from Chad Turner, a certified public accountant, which exposed Lapides's report as "useless for any purpose" because of its "numerous errors, omissions of material facts and information, incompetence, untrue statements, bias, gross inaccuracies, and the like." Counsel for the Plaintiffs urged Gonzalez and Hinds in the strongest terms that if they had any questions about Turner's expertise or the conclusions in Turner's report, they should retain an independent expert of their own, pointing out Lapides's obvious bias and conflict of interest, and warning them that if they continued to pursue Gonzalez I and II they would be doing so with malice or deliberately turning a blind eye to the truth, and that if the Plaintiffs prevailed in the litigation they would sue the Defendants for malicious prosecution. The Plaintiffs further stressed that virtually all the conduct complained about was engaged in by Jay and Randy Johnson, and that Debbie and Robin Johnson were free from any taint of fraud or wrongful conduct and should be immediately dismissed. The pleas for Debbie and Robin fell on deaf ears and they felt the full brunt of the onslaught.

19.    The Defendants acted with malice in initiating and continuing Gonzalez I and II and acted primarily for purposes other than succeeding on the merits, such as forcing a settlement from the Plaintiffs. The Plaintiffs were harmed by the initiation and continuation of Gonzalez I and II, suffering out of pocket loss in the form of attorney fees and costs in defending against fabricated claims, as well as suffering emotional distress and injury to reputation because of groundless allegations made in pleadings which are public records and made in spite and ill will and magnified by slanderous allegations, and the Defendants's conduct was a substantial factor in causing the Plaintiffs's harm.

12

## III.   THE EVENTS LEADING TO BANKRUPTCY

### A.   Early Events and the First Transaction between the Johnsons and Lapides

20.   The early events leading to the filing of bankruptcy evidence the great hostility, hatred, and ill will Lapides had toward Jay and Debbie Johnson and demonstrate Lapides's malicious attitude in pursuing the Johnsons in litigation for years.

21.   Jay Johnson grew up in Southern California. He obtained his Bachelor of Architecture in 1977 from California Polytechnic State University, San Luis Obispo. Jay paid his way through college, but his financial resources were exhausted by the time he graduated and started his architectural career with Cornwall & Associates in Pasadena, California.

22.   Jay Johnson became acquainted with Lapides in 1979.

23.   Jay and Debbie Johnson married in 1980.

24.   In 1981, Jay and Debbie Johnson together with Lapides purchased a piece of property on Castle Road in La Cañada, California (the "Castle Road Property"), and split the property into two lots. To split the property, it was necessary for them to obtain a separate water meter for the back lot. Jay and Debbie Johnson lived in a home on the front lot, and Lapides lived in a home on the back lot, where he lives today.

25.   In 1984, Jay Johnson started his own architectural business and formed JJ-AIA, incurring the expense attendant to such an enterprise. Jay Johnson is and always has been the sole owner of JJ-AIA. Jay was successful as an architect, and for the most part earned a good living, but he and Debbie were never affluent, and circumstances were such that they were never able to accumulate much wealth.

### B.   The La Forest Drive Properties

26.   In early 1987, Jay and Debbie Johnson purchased vacant land behind 5495 La Forest Drive from Joseph Oliver for $250,000 (the "Oliver Property"). To purchase the property, they paid $100,000 in cash, $30,000 from their savings and $70,000 borrowed from a private party secured by a third deed of trust on their home on Castle Road. For the

---

COMPLAINT

1   balance of the purchase price they signed a note in favor of Oliver in the amount of

2   $150,000, secured by a second deed of trust on their home on Castle Road. Their plans

3   were to build a home for themselves on the property.

4        27.   Before Jay and Debbie purchased the Oliver Property, it was part of a larger

5   piece of property which Oliver split into two lots. Oliver owned a home on the front or

6   lower lot (5495 La Forest Drive) and Jay and Debbie purchased the back or upper lot. It

7   was inconceivable to Jay, an architect specializing in designing homes in the La Cañada

8   area, that the city would permit the lot split and approve the lot for building a home if for

9   some reason a water meter could not be obtained for the lot, because without a water meter,

10  the owner would be prohibited from building on the lot. In his experience as an architect,

11  Jay knew the lot could not be split if a water meter could not be obtained for the lot, and

12  he and Lapides had just a few years earlier, gone through the exercise of splitting the Castle

13  Road Property to obtain a water meter for the back lot where Lapides lived.

14       28.   When Jay and Debbie Johnson were considering buying the Oliver Property,

15  they asked the broker, Mary Ellen Moore, a well-known and experienced real estate broker

16  in La Cañada, if there was water on the property. Moore pointed out the many fruit trees

17  on the property and turned on a hose bib through which water flowed. Jay also asked

18  Moore where the water meter was located, and she pointed out a water meter next to the

19  curb on the street (where water meters are located) near the driveway to the property. Jay

20  and Debbie and Moore, assumed that was the water meter for the lot.

21       29.   A few months after purchasing the Oliver Property, Jay Johnson obtained

22  from Virginia Tryon an option (the "Johnson Option") to purchase from her a second

23  parcel of real property on La Forest Drive (the "Tryon Property") adjacent to the Oliver

24  Property. In speaking with the La Cañada City Planner, Jay believed the Tryon Property

25  could be subdivided into four or five lots, and it was his plan to subdivide the property as

26  a development project.

27

28

14

1.     **The Lapides Property**

30.     After Jay and Debbie Johnson purchased the Oliver Property and had secured the Johnson Option, Lapides approached the Johnsons and proposed the Johnsons split the Oliver Property into two lots, like had been done on the Castle Road Property, and that the Johnsons sell one of the lots to Lapides, suggesting the Johnsons build their house on the other lot. Jay and Debbie walked Lapides around the Oliver Property and pointed out where he could build a house on the property. As they walked around the property, Lapides inquired as to whether there was water on the property, and, like Moore did for them, the Johnsons turned on a hose bid through which water flowed and pointed out the water meter at the curb by the driveway.

31.     On August 28, 1987, Jay and Debbie Johnson sold the Oliver Property to Lapides (the "Lapides Property"). The terms of the sale of the Lapides Property were as follows:

a.     Lapides was to make a $50,000 down payment prior to close of escrow (the "Cash Down Payment"). Lapides put $500 down in escrow, and when he did not come up with the Cash Down Payment by the close of escrow on November 2, 1987, the Johnsons agreed to accept an unsecured note for $50,750 (interest included) payable December 1, 1987. As was his wont, Lapides failed to pay the note on time, causing the Johnsons a loss of interest.

b.     Lapides was to sign a note for $15,000, secured by a deed of trust on his home on Castle Road, with payments to begin one year from close of escrow with all unpaid interest and principle due two years from close of escrow or one year from the date it was determined the lot could not be split, whichever came first (the "$15,000 Lapides Note"). Lapides did not sign the $15,000 Lapides Note until March 1, 1988, the Johnsons losing four months' interest in the amount of $609. Lapides never paid the full amount of the note, nor did he pay it on time (see below).

c.     Lapides was to sign a second note for $150,000, also secured by a deed of trust on his home on Castle Road, with payments of interest or more commencing

15

1  the first month following close of escrow with all unpaid interest and principal due August

2  1, 1988. Instead of giving the Johnsons a note for $150,000, in March 1988, Lapides paid

3  the Johnsons $30,000 and gave them a note in the amount of $120,000 (the "$120,000

4  Lapides Note"), bearing interest from March 1, 1988, the Johnsons thus losing four

5  months' interest in the amount of $4,000. Payments on the note were to commence April

6  1, 1988, with all unpaid interest and principal due August 1, 1988. Lapides never paid the

7  full amount of the note, nor did he pay it on time (see below).

8          d.      Lapides was to pay Jay and Debbie Johnson fifty percent of the profit

9  derived from the sale of certain gold and silver coins he owned not exceeding $10,000.

10  The Johnsons never heard whether Lapides ever sold the coins and they never received

11  anything from the sale of the coins if the coins were sold.

12          e.      Jay and Debbie Johnson were to convey to Lapides an undivided

13  ninety percent interest in the Lapides Property, and were to transfer the remaining ten

14  percent interest once Lapides made a $35,000 principal reduction. By Grant Deed recorded

15  November 2, 1987, the Johnsons transferred an undivided ninety percent interest in the

16  Lapides Property to Lapides. When Lapides paid the Johnsons $30,000 in March (as

17  opposed to the contemplated $35,000) and signed the $120,000 Lapides Note, the

18  Johnsons conveyed the remaining ten percent interest in the Lapides Property to Lapides

19  by Grant Deed recorded June 2, 1988.

20          f.      If the lot could be split, the Johnsons were to convey to Lapides the

21  upper lot and Lapides was to convey to the Johnsons the lower lot, for $1 each.

22          g.      If the lot could not be split, Lapides was to pay the Johnsons an

23  additional $60,000 for the property, all interest and principal due one year from the close

24  of escrow or whenever it was determined the lot could not be split, whichever came later.

25  In addition, costs of improvements were to be shared fifty-fifty, but if the lot could not be

26  split, Lapides was to reimburse the Johnsons for their share of the improvements. The lot

27  was not split, but Lapides never reimbursed the Johnsons for their share of the

28  improvements.

COMPLAINT

h.    Jay Johnson was to provide and did provide Lapides with a preliminary site grading plan, together with elevations, perspectives, and floor plans of a house for Lapides on the property.

i.    Lastly, Lapides added to the end of the agreement: "Seller guarantees that a single-family residence can be constructed on the subject site, and that … water … [is] available to the site" (the "Water Guarantee").

## 2.    The Johnson Property and the Lapides Option

### a.    The Johnson Property

32.    After ten years of hard work, Jay Johnson had gained a reputation in the La Cañada and surrounding area community as a talented and superb architect and had a bright future ahead of him. As a reflection of his status in the community, Jay Johnson designed and built a large house on a lot the Johnsons purchased on Greenridge Drive in La Cañada, and in May 1988, the Johnsons sold their house on Castle Road and moved into the new house on Greenridge Drive.

33.    The $120,000 Lapides Note was due August 1, 1988, but Lapides complained he was unable to pay the note and the Johnsons let the due date pass as an accommodation to him. Lapides was supposed to pay at a minimum interest monthly, and while Lapides did pay some interest, he did not pay all interest due, nor did he always pay on time.

34.    On October 20, 1989, the Johnsons exercised the Johnson Option and purchased the Tryon Property for $700,000 (the "Johnson Property"). The Johnsons paid $50,000 in cash and signed a note for $650,000 for the balance (the "Tryon Note"). It was contemplated that the property could be subdivided into five lots. One of the lots was to be re-conveyed to Tryon who was going to build a home for herself on that lot, and the Johnsons intended to build a home for themselves on one of the other lots.

35.    In April 1990, the Johnsons needed the money owing on the $120,000 Lapides Note, now almost two years past due, to proceed with the development of the Johnson Property and to meet their other expenses. Lapides was well aware of the

17

Johnsons's predicament, and told them he would not pay the note unless they discounted the amount owing. The Johnsons abhorred contention and had been taught to avoid litigation whenever possible and were loath to start a lawsuit to collect on the note. In addition, they had little money to hire a lawyer and needed the money to continue their project and meet their other expenses, and so on April 12, 1990, they capitulated to Lapides's demands and agreed to a discounted payment in the amount of $102,000, thus losing $18,000 principal and whatever interest Lapides had not paid.

### b.    The Lapides option

36.    On April 12, 1990, even though the Johnsons accepted a discount on the $120,000 Lapides Note, Lapides also refused to pay the note unless the Johnsons granted him an option (the "Lapides Option") to purchase three parcels of the Johnson Property that surrounded the upper portion of the Lapides Property. The option agreement was amended August 1, 1993, and, again, on May 27, 1994, and on April 9, 1996, Lapides allegedly exercised his option to purchase the property.

### 3.    The property line dispute with the Coutins

37.    The Lapides Property was also adjacent to property owned by The Elias Coutin & Anne Coutin Family Trust (the "Coutin Trust") (the "Coutin Trust Property"). A paved road off La Forest Drive straddled the two properties, over which Lapides, the Coutins, and Oliver had an easement to access their various properties. Lapides contended he had an exclusive prescriptive easement that extended some distance across the paved road onto the Coutin Trust Property, and Lapides erected a chain link fence and gate on part of the Coutin Trust Property. The Coutins disputed the matter, had the property surveyed, and began erecting a fence on the property line. Lapides removed the surveyor's markers, threw the fence posts onto the Coutin Trust Property, scattered the cement and sand that was brought to erect the fence, and threatened the Coutins not to touch his fence and gate. On July 10, 1990, Lapides filed suit against Elias and Anne Coutin, on September 5, 1990, the Coutin Trust filed suit against Lapides, and Lapides filed a cross-complaint (the "Lapides/Coutin Litigation"). Lapides asked Jay Johnson if Jay could recommend an

attorney who would represent him in the Lapides/Coutin Litigation. Jay recommended Craig Rossell, a good friend and member of the LDS Church with the firm Hunt, Ortmann, Blasco & Palffy. Although Rossell sent Lapides a written fee agreement, Lapides never signed and returned the agreement.

### 4.    The Yamashiro Property

38.    The Johnsons's finances were drained trying to develop the Johnson Property and they realized they needed a financial partner to make the payments on the Tryon Note and to get a loan to develop the property. In November 1990, the Johnsons agreed to sell one of the future lots on the Johnson Property to Vernon and Cathy Yamashiro on which the Yamashiros intended to build a home for themselves. In addition, the Johnsons entered a joint venture with the Yamashiros to develop the Johnson Property. The Yamashiros were responsible for the financial expenses, and Jay Johnson was the development project manager and architect for the homes to be built on the lots. This became a pattern Jay followed on many occasions throughout his career: Jay would find property, tie it up in escrow, and find a financial backer to develop the project with Jay being the architect and project manager.

39.    It was about this time the Johnsons sold their home on Greenridge Drive. The home was high in the foothills and electrical power lines almost directly overhead were causing considerable concern in the community about possible injury from radiation, especially to young children. The Johnsons's fourth child had just been born and Debbie was extremely upset about the potential danger from the power lines and so Jay and Debbie decided to sell their home. Unfortunately, in addition to the power line issue depressing the value of the property, the real estate market had taken a severe downturn and they sold their home for less than was owed on the mortgage. For the next five years, Jay and Debbie rented a small home on Gould Avenue in La Cañada.

### 5.    The Johnsons's loss on the Lapides Property

40.    The $15,000 Lapides Note was due November 2, 1990. Again, with their joint venture with the Yamashiros and their financial difficulties the Johnsons needed the

19

money owed on the note. As of January 16, 1991, the total amount of principal and interest owing was $21,355, but Lapides again took advantage of the Johnsons's situation and forced them into accepting a discounted payoff in the amount of $18,000, thus losing another $3,355 on the deal with Lapides.

41.     Lapides owed the Johnsons $275,000 for the Lapides Property, but paid no more than $195,000, and paid less interest than was owed. The result was the Johnsons lost at least $55,000 ($250,000 - $195,000) out-of-pocket on the sale to Lapides because Lapides refused to pay what he owed.

### C.     Lapides's Threats Re: The Lack of Water on the Lapides Property

42.     In early 1992, Jay Johnson learned that the La Forest Drive Properties (*i.e.*, the Johnson Property and the Lapides Property) did not have access to water. This occurred at a public city planning commission meeting where Jay was presenting his subdivision plan for the Johnson Property and Doug Caister from the La Cañada Irrigation District ("LCID") stood up and announced to the amazement of everyone present: "I think I should tell you there is no access to water on that property." It was explained that the LCID would not permit a water meter for the properties in question because the LCID could not supply sufficient water in the case of fire at the higher elevations. That was the first Jay had ever heard that water was not available on the La Forest Drive Properties. Within a day or two he told Lapides what he had learned from Caister. Lapides began making threats to sue Jay and Debbie, Oliver, Mary Ellen Moore, the escrow company, the title company, the City of La Cañada, and others, for fraud in the sale of the Lapides Property, and threatened to attach the Johnsons's assets, including the Johnson Property. Lapides also wanted Jay and Debbie to assign to him all claims they had against everyone else regarding this matter. It was about this time Lapides began threatening Jay and Debbie that if they did not meet his demands he would have the IRS investigate them and make their lives miserable. The Johnsons knew Lapides worked for the IRS, and while they felt they had never done anything that would cause the IRS to criticize them they did not know what kind of trouble Lapides could cause them because of his position with the IRS. Lapides also demanded

20

that the Johnsons pay all the legal expenses incurred in a lawsuit he threatened to file against the City of La Cañada and the LCID to obtain water on the property.

43.    Lapides's accusation that the Johnsons defrauded him by lying about water on the property was absurd on its face: First, if the Johnsons had known there was no water on the Oliver Property, they would not have bought the property in the first place, and, if they had discovered there was no water before the sale to Lapides, they would have told Lapides and would not have guaranteed there was water. Second, if they had known there was no water on the property, they would not have bought the adjoining Tryon Property which likewise did not have water on the upper portion where they planned to develop the lots (like the Oliver Property, there was water on the lower lot (see above)), nor would they have expended time and money to develop the property. If there was any fraud involved in the matter, it was on the part of Lapides, who, being ever vigilant, likely discovered there was no water on the property, concealed that fact from the Johnsons, and inserted the rather unusual Water Guarantee in the contract believing he could then force the Johnsons to pay for obtaining access to water.

## 1.    The offers to repurchase the Lapides Property

44.    Jay and Debbie Johnson had been taught by their church to always deal honestly and fairly with others, and because they were mistaken about the availability of water on the Lapides Property they felt a moral obligation to make things right with Lapides and offered to repurchase the property for what Lapides paid (or, more accurately, what he asserted he paid ($225,000) since he did not pay the full amount (see below)), plus interest. Lapides refused the offer unless the Johnsons paid him an additional $200,000, which they were unable to do and were not inclined to do. The Johnsons offered to repurchase the property on various occasions over the ensuing years, but were always rebuffed by Lapides. When Lapides refused their offer, the Johnsons embarked on a long and costly effort to get water to the Lapides Property.

21

### 2.    The first efforts to obtain water on the Lapides Property

45.    The Johnsons and the Yamashiros commenced efforts to obtain water not only on the Johnson Property, but likewise on the Lapides Property and without expense to Lapides. In that regard, they were working with the LCID to build their own water tank and to provide Lapides access to the water without cost. Upon the recommendation of the LCID, they retained Perliter & Ingalsbe, an engineering firm in Glendale, to do a feasibility study to see if and where they could build a water tank on the La Forest Drive Properties. The report indicated that the project was feasible and specified the size of tank and where to build it on the property. In early 1993, the LCID approved the building of a tank, and indicated that the La Forest Drive Properties could be annexed into their service area if the tank was turned over to the LCID when it was finished. Jay Johnson immediately communicated this information to Lapides.

### D.    Lapides's Further Disputes with his Neighbors

46.    Oliver had sold the front lot of his property to a Mr. Hughs, who sold it in 1988 to Steven Fabos. A driveway/parking lot to Fabos's house on the lower lot was just off the paved road over which Lapides, the Coutins, and now Fabos, had an easement to access their various properties. Lapides wanted to bring his fence down to the middle of the driveway/parking lot adjacent to Fabos's house, and told Fabos that if Fabos did not pay for one-half of the fence, Lapides would put his fence down the middle of the driveway. Further, Lapides fenced off the rear part of the Fabos property that bordered on the Lapides Property, and in doing so tore down trees and a brick walkway that were used and enjoyed by Fabos. In doing this work, Lapides hired Robert Frame, a member of the LDS Church, to remove stumps and do some grading on the Lapides Property, and then argued with Frame over the work and never paid him for his services. Lapides then complained that the Coutins were doing the very same thing he had done when they built a fence on their property line. In 1993 Fabos sold the property to Paul Masson, and the court in the Lapides/Coutin Litigation found that one of the reasons Fabos moved was because of his dealings with Lapides.

22

**E.    The Canyon Meadows Property**

47.    About mid-year 1993, Jay Johnson's step brother, Dean Hemstreet, learned of a tract of land near Provo, Utah, called Canyon Meadows, which was for sale by the FDIC, and told Jay that he (Jay) might be interested in the property. Jay looked at the property, believed it could be successfully developed, and was able to scrape up $25,000 to open escrow and tie-up the property. Although not specifically mentioned in the complaint in Gonzalez II, at trial the Defendants alleged the Debtors failed to disclose their interest in the Canyon Meadows Property as a basis to revoke their bankruptcy discharge. As shown below, there was no evidence to support the allegation, the evidence conclusively supported the Debtors's position, and the Defendants were aware of these facts before filing suit.

**F.    The Settlement Between the Johnsons and Lapides**

48.    On August 1, 1993, Jay and Debbie Johnson and Lapides reached a settlement regarding the issue of water on the Lapides Property. The settlement agreement provided, among other things, that Jay and Debbie would sign a note for $225,000 plus interest from the date Lapides purchased the Lapides Property, payable $500 per month with the balance due in three years unless work had commenced with construction of the improvements necessary to obtain water on the property and the Johnsons elected to extend the note for one more year and pay $1,000 per month during the fourth year (the "1993 Johnson Note"). It was contemplated that the water tank the Johnsons and the Yamashiros planned on building would be built within four years and would solve the problem of getting water to the Lapides Property. Upon water being provided to the Lapides Property, the 1993 Johnson Note was to be canceled. If the Johnsons were not able to provide water to the Lapides Property within four years, Lapides's sole recourse was limited to the 1993 Johnson Note.

49.    As part of the settlement Lapides was also to sign a note for $30,000, payable $60 per month commencing upon the earlier of either the date water was provided to the Lapides Property or the date the 1993 Johnson Note was due and payable in full (the "First

Lapides Note"). This note was designed to partially reimburse the Johnsons and the Yamashiros for the costs incurred in getting water to the Lapides Property, as it was understood the cost of obtaining water would far exceed $30,000. Lapides was also to sign a second note for the total amount of payments made by the Johnsons pursuant to the 1993 Johnson Note (the "Second Lapides Note"). This note was designed for Lapides to pay back the money the Johnsons paid Lapides once water was provided to the property, it being understood that Lapides could not keep the money the Johnsons paid him as if he had no water when in fact he did have water. It was also agreed that Lapides would "pay all costs with respect to the [Lapides] Property, including without limitation, all … legal fees," which was intended to specifically include all fees owed Rossell in the Lapides/Coutin Litigation.

50.    As part of the settlement the Lapides Option was amended to extend the time within which to exercise the option to purchase one of the three parcels of property to coincide with the time within which to purchase the other two parcels of property.

51.    The settlement agreement concluded with a mutual release of all claims, extinguishing Lapides's claim of fraud, a waiver of the benefits of Section 1542 of the California Civil Code, no admission of liability by any party, and an agreement to keep the settlement confidential.

### G.    The Lawsuit on the 1993 Johnson Note and the Offer to Settle with the Johnsons and the Coutins

52.    The first payment of $500 under the 1993 Johnson Note was due September 1, 1993, and the second payment of $500 was due October 1, 1993, and Jay Johnson wrote checks out to Lapides for those payments. Jay was not in the habit of keeping a running balance in his checkbook, but believed at the time he wrote the checks he had enough money in the checking account to cover the checks. Jay had recently scraped together what money he could to tie-up the Canyon Meadows Property, and with that and whatever other expenses he had to pay he apparently did not have enough money in his checking account to pay the checks he gave to Lapides. As a result, the checks to Lapides for the first two

payments were not paid. Rather than give the Johnsons time to get their finances in order, and to reciprocate for the leniency the Johnsons had extended to him in paying his obligations, Lapides immediately declared the full amount of the 1993 Johnson Note due and payable and on November 9, 1993, filed suit against the Johnsons in Los Angeles Superior Court. By doing this, Lapides ensured he would be paid back all his money and still retain the property—an unconscionable result.

53.    On December 9, 1993, Lapides gave the Johnsons and the Coutins a package offer in which he agreed to "drop" the lawsuit against the Johnsons and terminate the Lapides/Coutin Litigation regarding the easement dispute upon the following conditions:

a.    Jay and Debbie were to pay all past amounts due under the 1993 Johnson Note which Lapides claimed was $4500. The past due amounts, however, were $500 per month plus the late payment penalty of $50 for each missed payment which only totaled $2200 for the four months.

b.    Jay and Debbie were to execute a judgment for the full amount of the debt which Lapides would then record.

c.    Jay and Debbie were not to sell any of the Johnson Property lots until Lapides was given water on his property or the debt paid in full.

d.    The Coutins were to apply for no more than three lots on their property adjacent to the Lapides Property.

e.    The Coutins were to pay for and construct a main road all the way to Lapides's proposed new residence on the Lapides Property as approved by Lapides.

f.    The Coutins were to grant Lapides his choice of one of the new lots created off the new road to the Lapides Property.

g.    The Coutins were to pay for their share of building the water tank planned by the Johnsons and the Yamashiros.

54.    The Coutins immediately rejected the offer, and Jay and Debbie had no money to retain an attorney nor could they meet Lapides's demands. Consequently, on May 12, 1994, Lapides obtained a default judgment against the Johnsons in the amount of

25

$383,701.73 for principal, interest, costs, and attorney's fees (the "Lapides Judgment"). In effect, Lapides had now obtained the Lapides Property for free—an unconscionable result. The obtaining of the judgment on the 1993 Johnson Note was a novation that merged the obligation on the note into the Lapides Judgment and the obligation on the note was extinguished. Lapides recorded an Abstract of Judgment on May 18, 1994, creating a lien on all property owned by the Johnsons, including the Johnson Property.

### H.    The 1994 Johnson Note and Amendment to the Lapides Option

#### 1.    The 1994 Johnson Note

55.    A few days after recording his judgment, Lapides demanded that Jay and Debbie Johnson sign a new note for $400,000, unjustly adding approximately $16,000 to the amount owed on the judgment. Lapides also demanded Janis Lapides be added as a payee of the note, and the note be secured by a deed of trust on the Johnson Property. Lapides threatened the Johnsons that if they did not sign the note and deed of trust he would execute on his judgment and have the Johnson Property sold at auction which would create enormous complications for the Johnsons with the Yamashiros.

56.    Pressured by Lapides's threats the Johnsons signed a new promissory note dated May 27, 1994, for $400,000, payable to both Richard and Janis Lapides (the "1994 Johnson Note"), but they did not sign the deed of trust that would have secured the note. The obtaining of the 1994 Johnson Note was a novation that merged the obligation on the Lapides Judgment into the Note and extinguished the obligation on the judgment, but Lapides never filed with the court or served on the Johnsons as required by law an acknowledgment of satisfaction of judgment. It was not until after the bankruptcy was filed that the Johnsons learned the 1994 Johnson Note extinguished the Lapides Judgment.

#### 2.    The amendment to the Lapides Option

57.    As indicated above, Jay and Debbie Johnson granted Lapides an option to purchase a portion of the Johnson Property. The option pertained to three different parcels of property, designated Parcels 1, 2, and 3. The option to purchase Parcel 3 had expired on April 12, 1993. With the threat of execution on the Lapides Judgment, on May 27, 1994,

26

in addition to signing the 1994 Johnson Note, Lapides coerced the Johnsons into amending the option agreement to "extend" the Lapides Option with respect to Parcel 3 to April 12, 1998, the same date as the expiration of the option for Parcels 1 and 2.

**I.    The Decision of the Court in the Lapides/Coutin Litigation and Richard and Janis Lapides Engage in Fraudulent Conveyances**

58.    On June 28, 1994, title to Lapides's home on Castle Road was transferred from Lapides as his sole property to Richard Lapides and Janis Lapides in joint tenancy.

59.    On November 14, 1994, the court rendered its decision in the Lapides/Coutin Litigation. The court quieted title in both Lapides and the Coutin Trust in certain respects, and granted Lapides a non-exclusive prescriptive easement over that part of the paved road that was on the Coutin Trust Property, limited to ingress and egress to vacant land and no other use without further order of court. In addition, Lapides was ordered to remove the chain link fence and gate he had erected on the Coutin Trust Property.

60.    As indicated above, Lapides retained Craig Rossell and his firm to represent Lapides in the Lapides/Coutin Litigation. Lapides refused to pay Rossell for services rendered, and on December 5, 1994, the Hunt Ortmann firm sued Lapides in Los Angeles County Superior Court for the unpaid fees. One week later, on December 12, 1994, Lapides signed a Grant Deed back-dated to December 1, 1994, transferring title to the Lapides Property on La Forest Drive to Janis Lapides, in her maiden name, Janis Thornley, as her sole and separate property, recording the Deed five weeks later, on January 10, 1995. Title to the Lapides home on Castle Road was also transferred to Janis Lapides in her maiden name, Janis Thornley, as her sole and separate property, by Grant Deed recorded January 10, 1995. The transfers of the La Forest Drive and Castle Road properties were obvious fraudulent transfers to hinder, delay, or defraud the Hunt Ortmann firm in obtaining payment for unpaid legal fees. Lapides and the Hunt Ortmann firm agreed to arbitration which took place on March 30 and May 1, 1995. Because Lapides did not sign and return the written fee agreement sent to him by Rossell, the Hunt Ortmann firm was limited to a *quantum meruit* recovery, and on May 17, 1995, the arbitrators issued an award

27

1    to the Hunt Ortmann firm in the amount of $15,624, the Hunt Ortmann firm taking a loss

2    of $21,616.68. On June 21, 1995, the Hunt Ortmann firm filed a petition in the Los

3    Angeles Superior Court to confirm the award, and Lapides finally paid the amount due on

4    July 12, 1995.

5    **J.     The 1994 Johnson Note and the Demise of the Johnson/Yamashiro Joint**

6    **Venture**

7    **1.     The 1994 Johnson Note**

8        61.     The 1994 Johnson Note called for payments of $500 per month from July 1,

9    1994 to and including July 1, 1996, at which time the unpaid balance would be due unless

10   Jay and Debbie Johnson elected to extend the note for one year with payments increasing

11   to $1,000 per month. The Johnsons made twenty-five payments of $500 each and twelve

12   payments of $1,000 each totaling $24,500.

13   **2.     The demise of the Johnson/Yamashiro joint venture**

14       62.     As indicated above, in November 1990, Jay and Debbie Johnson sold one of

15   the future lots of the Johnson Property to the Yamashiros, and entered a joint venture with

16   the Yamashiros to develop the Johnson Property. As part of the development, the

17   Yamashiros negotiated a $400,000 construction loan for the construction of a water tank

18   (estimated to cost approximately $500,000) that would supply water to all the La Forest

19   Drive Properties, including the Lapides Property. The Lapides Judgment had been

20   recorded and was shown as a lien against the Johnson Property (although the lien should

21   have been released with the extinguishment of the Lapides Judgment). The construction

22   lender insisted it have a first lien on the Johnson Property to secure the construction loan,

23   and Tryon agreed to subordinate her note. The Johnsons and the Yamashiros asked Lapides

24   to subordinate his judgment lien to the lender's deed of trust so that construction of the

25   water tank could proceed, and the Yamashiros agreed to sign a contract with Lapides

26   guaranteeing they would build the water tank and offered to let him have the full benefits

27   of the water tank at no cost to him.

28

63.    Lapides agreed to subordinate the lien *only if* the Yamashiros paid him $200,000. The Yamashiros were shocked, and flatly refused.

64.    On April 1, 1995, Lapides agreed to subordinate the judgment lien if the Johnsons and the Yamashiros met the following demands:

a.    The Yamashiros were to supply water to the Lapides Property by July 1, 1997 at no cost to Lapides.

b.    The Yamashiros were to take $100,000 of the new $400,000 construction loan to pay down the $650,000 Tryon Note, notwithstanding the construction loan was restricted to building the water tank, and the Tryon Note was to be subordinated to the new construction loan.

c.    The Yamashiros, as beneficiaries, were to release with a full satisfaction the $232,992 trust deed on the Johnson Property of which the Johnsons were the trustors.

d.    The Yamashiros were to execute a note in favor of the Lapideses for $400,000 with terms similar to the terms in the 1994 Johnson Note (with payments on the 1994 Johnson Note to be considered equal payments on the Yamashiro note). The offer also provided that if water was made available to the Lapides Property the Yamashiro note would be cancelled (but not the 1994 Johnson Note).

e.    The Yamashiros were also to grant Lapides an option to purchase the property that was the subject of the Lapides Option.

65.    The Yamashiros considered Lapides's demands to be totally unreasonable and rejected his demands. The Johnsons and the Yamashiros tried for several months to work things out with Lapides, and the Yamashiros promised Lapides that they would do all they could to get water to the Lapides Property. Lapides, however, would not cooperate and continued making his demands. The Yamashiros were so disgusted with Lapides, and so fearful of having any dealings with him, that rather than try to work out some arrangement with Lapides whereby the project could go forward, they walked away from the project, losing their investment of approximately $300,000.

29

66.   When the Yamashiros withdrew their financial backing to develop the Johnson Property, Jay and Debbie Johnson were unable to continue the project, and on March 15, 1996, foreclosure proceedings were begun and Jay and Debbie executed a deed in lieu of foreclosure. As a result, Jay and Debbie lost their investment in the Johnson Property, approximately $100,000, plus their time and effort.

**K.     The Viro Road Property**

67.   In early 1995, Jay and Debbie Johnson were told they would have to vacate the home they were renting on Gould Avenue. Jay found a home for sale at 4600 Viro Road (the "Viro Road Property") he believed could be remodeled and would be a nice home for he and his family if in time they could acquire it. Because Jay and Debbie were unable to purchase the house, Randy agreed to buy the house and rent it to Jay and Debbie. In Gonzalez I and II, the Defendants alleged the purchase of the Viro Road Property was a fraudulent conveyance, that Jay and Debbie, not Randy and Robin, bought the property, and sought to obtain the value of the property in the litigation. As shown below, there was no evidence to support the allegations, the evidence conclusively supported the Debtors's position, and the Defendants were aware of these facts before suit was filed.

**L.     The June 2000 Agreement**

68.   On June 15, 1996, Lapides sent Jay and Debbie Johnson a notification that the principal amount of the 1994 Johnson Note due on July 31, 1996 would be $459,229.84 (Lapides double-counting the last $500 payment), and that if they elected to extend the due date of the note for another year the monthly payment would increase to $1,000 per month commencing August 1, 1996. Jay and Debbie continued to make payments in the increased amount for the next year.

69.   In 1997, after the 1994 Johnson Note became due and payable, Lapides tried to get Jay and Debbie to agree to a modification of the note which added JJ-AIA as an obligor and included additional amounts above and beyond anything Jay and Debbie were obligated to pay. Lapides also demanded that if, in attempting to provide water to the Lapides Property, the LCID required Jay and Debbie to "purchase any land, construct a

30

water tank, pump station, or other improvements in order to make such water available to the Lender's property, or make payment for annexation," they would do so "at no cost" to Lapides. On October 16, 1997, to force Jay and Debbie to sign the modification agreement, Lapides obtained a writ of execution and wrongfully executed on the Lapides Judgment, not only against Jay and Debbie's personal accounts, but also against the account of JJ-AIA. The execution on the judgment was in fulfillment of Lapides's constant threats that he could come after Jay Johnson's business anytime he wanted. Jay later came to understand that that was a wrongful execution in two respects: first, the judgment had been extinguished, and, second, the judgment was not against JJ-AIA. Jay and Debbie Johnson refused to sign the modification agreement as it would have been impossible for them to ever satisfy its terms. In the meantime, Jay and Debbie continued making payments on the 1994 Johnson Note, increasing the amount paid monthly as time progressed and Lapides demanded, and which Lapides accepted. Debbie begged Jay to file bankruptcy to remove this burden from their lives, but Jay was worried doing so would ruin his reputation as a developer and architect, and he felt that somehow, he could get water to the Lapides Property and solve their problem in that manner.

70.    Lapides made similar attempts to modify the 1994 Johnson Note in 1998, 1999, and early 2000 (again, wrongfully executing against Jay and Debbie's personal accounts as well as against JJ-AIA's account in April 1998, November 1998, and May 2000) with ever increasing obligations that were impossible for the Johnsons to meet and which they did not accept, including a $500 late payment penalty and the bizarre demand that Jay Johnson sign an unconditional and irrevocable power of attorney in favor of Lapides "to remain in full force and effect until canceled by the Lender when the entire unpaid balance of this note … is paid in full …."

71.    Jay had been struggling in his business while Randy had been very successful in his business. About the first of the year 1999, Randy and Jay discussed Jay's situation. Randy had a vision of expanding Jay's business from just designing single residence homes to designing and managing larger projects and hiring other architects for the

31

business, something Jay had never contemplated. As part of Randy's plan to reinvigorate Jay's business and undertake a new business venture for himself, in February 1999 Randy formed JJ&A. At trial the Defendants alleged Jay Johnson was the owner of JJ&A and had committed fraud on the bankruptcy court and the creditors, and, specifically, on Lapides, by not including his ownership of JJ&A on the Bankruptcy Schedules. As shown below, there was no evidence to support the allegation, the evidence conclusively supported the Debtors's position, and the Defendants were aware of these facts before filing suit.

72.    Lapides's unreasonable demands and periodic executions against Jay and Debbie's bank accounts brought them to a point where it was impossible to go any further with Lapides. Lapides kept demanding Jay and Debbie pay more each month, and in 1999 they were paying him $2500 a month. Jay and Debbie were stymied and, although the thought was repugnant to Jay, he considered filing for bankruptcy. At that point, Randy again stepped in to help Jay and Debbie, and beginning in January 2000 started making Jay and Debbie's payments to Lapides because Jay and Debbie were not able to make them.

73.    In addition, over the next several months Randy negotiated a settlement agreement between Jay and Debbie and Lapides. The La Forest Drive Property had recently come back on the market and Jay learned from Doug Caister that the LCID was thinking of building a water tank at the District's expense to mitigate a potential liability of not being able to provide enough water to fight a fire in this high-risk fire hazard area. During the negotiations, Jay tried to put together a new partnership, like the one with the Yamashiros, but was unable to do so. When it was evident Jay could not put together a deal to purchase the La Forest Drive property, Randy decided to purchase and develop the property himself and in the process, help Jay with his problems with Lapides. On June 8, 2000, Jay and Debbie Johnson individually and Jay Johnson in behalf of JJ-AIA signed a new agreement with Lapides (the "June 2000 Agreement").

74.    The June 2000 Agreement called for a $10,000 payment upon signing. Again, since Jay and Debbie did not have the money, Randy loaned them $10,000.00 to make the

1   payment. The June 2000 Agreement also called for monthly payments of $2500, but Jay

2   and Debbie were not able to make those payments so Randy arranged for the payments to

3   be made. These payments were not gifts but were loans which Jay and Debbie intended to

4   pay back when they could. The monthly payments were made through March 2001. The

5   payments due April 1, 2001 and thereafter were never made.

6       **M.    The Frame 10 Loan**

7       75.    On June 8, 2000, Randy Johnson gave a second deed of trust against the Viro

8   Road Property to secure a loan of $500,000 from Frame 10 Productions, LLC

9   ("Frame 10"), a company owned by Randy's friend, Michael McFall, and received at that

10  time the sum of $348,207. Pursuant to Randy's instructions to the escrow company the

11  draw was sent to Q Financial. At trial the Defendants alleged that because Jay and Debbie

12  owned the Viro Road Property, the Frame 10 loan was really to Jay and Debbie and that

13  Randy and McFall conspired with Jay and Debbie to conceal the loan and it was a fraud

14  on the bankruptcy court and the creditors, and, specifically, on Lapides, by not disclosing

15  it on the Bankruptcy Schedules. As shown below, there was no evidence to support the

16  allegation, the evidence conclusively supported the Debtors's position, and the Defendants

17  were aware of these facts before filing suit.

18      **N.    The La Forest Drive Property**

19      76.    On June 12, 2000, Q Financial made an offer to purchase the La Forest Drive

20  Property for the sum of $675,000, and made a $25,000 deposit on the purchase. On

21  August 31, 2000, Randy Johnson purchased the La Forest Drive Property from Robert

22  Picardo and Linda Pawlik as his sole and separate property. In Gonzalez I and II, the

23  Defendants alleged the purchase of the La Forest Drive Property was a fraudulent

24  conveyance, that Jay and Debbie, not Randy, bought the property, and sought to obtain the

25  value of the property in the litigation. As shown below, there was no evidence to support

26  the allegations, the evidence conclusively supported the Debtors's position, and the

27  Defendants were aware of these facts before filing suit.

28

33

## IV.    THE FILING OF BANKRUPTCY AND ITS AFTERMATH

### A.    The Filing of Bankruptcy

77.    Randy suffered severe financial reversals and it was clear to Jay and Debbie that with Randy's problems there was no way out for Jay and Debbie except to file for bankruptcy. The April 1, 2001 payment due Lapides under the June 2000 Agreement was not paid and Jay and Debbie were in default under the Agreement. Lapides was furious, declared Jay and Debbie in default for missing the payment and for not purchasing the La Forest Drive Property themselves, and said he would execute on his judgment against Jay and Debbie's accounts. On April 5, 2001, Jay and Debbie filed the Bankruptcy Petition.

78.    It is not feasible to detail everything that occurred following the bankruptcy and everything that happened at the trial of Gonzalez I and II. Suffice to say the Defendants had no evidence to prove their claims or any of the elements that had to be satisfied to prove those claims, and no reasonable person under the circumstances would have proceeded as did the Defendants.

### B.    Lapides's Violation of the Automatic Stay

79.    Faced with the prospect that the debt owed by the Debtors would be discharged and his monthly income terminated with the filing of bankruptcy, Lapides wasted no time in acting against the Debtors in violation of the automatic stay. On the day the Debtors filed for bankruptcy, David Reeder, counsel for the Debtors, verbally confirmed the bankruptcy filing with Lapides. The following day, April 6, 2001, Lapides signed an Application for Order to Appear for Examination for each of the Debtors, and prepared a Writ of Execution. The Superior Court signed the Orders to Appear for Examination and the Writ of Execution on April 9, 2001. On April 18, 2001, pursuant to Lapides's instructions, the sheriff served the Notice of Levy on Citizens Business Bank, instructing the bank to pay over funds not only in the Debtors's personal accounts but also funds in the account of JJ-AIA, and served the Orders to Appear for Examination on the Debtors.

80.     On April 26, 2001, the Debtors filed an Application for the Issuance of an Order to Show Cause ("OSC") why Lapides should not be sanctioned for violating the automatic stay, and on May 11, 2001, the court issued the OSC. On May 31, 2001, Lapides, represented by David Luna, filed his opposition to the OSC. In his declaration under penalty of perjury Lapides denied Reeder had told him the Debtors had filed for bankruptcy, insisting instead that Reeder merely told him, "'we're filing a bankruptcy,' in the future tense."

81.     Lapides further testified he did not learn of the bankruptcy until April 16, 2001, when he received the Notice of Chapter 7 Bankruptcy Case issued by the clerk of the court on April 9, 2001. Lapides testified he had never heard the term "automatic stay" until he received the Notice. Lapides then falsely testified that after receiving the Notice he "took no action to enforce" his judgment. On August 1, 2001, the court found Lapides "willfully violated the automatic stay," and ordered sanctions against Lapides in the amount of $6,448.

### C.     The Issue of Shareholder Loans to Jay Johnson

82.     At trial, Gonzalez and Lapides focused intensely on the shareholder loans from JJ-AIA to Jay Johnson listed in the Bankruptcy Schedules in the amount of $450,000. The Defendants savagely attacked the Debtors for lying as to the amount of shareholder loans and hotly accused them of refusing to produce documents, including JJ-AIA's tax returns to confirm the amount of shareholder loans. The Defendants repeatedly argued they did not discover the truth about the loans until after they subpoenaed JJ-AIA's tax returns from Michael Sy, the company's tax preparer, in July 2004. The evidence, however, conclusively showed the Debtors had made an innocent mistake on the Bankruptcy Schedules, that they did produce the requested tax returns, that the Defendants were immediately aware of the error and did nothing about it because it made no difference in the case, that the Defendants maliciously accused the Debtors of falsely listing the amount of the loans on the Bankruptcy Schedules as a ground for revoking the Bankruptcy

35

Discharge, and that Gonzalez and Lapides testified falsely regarding the facts to cover-up the false charge.

### 1.   The error in the amount of the shareholder loans

83.   To lie is to make untrue statements knowingly, especially with intent to deceive. When Jay and Debbie Johnson met with their bankruptcy counsel, Reeder escorted them to a conference room, gave them a pad of paper, and without giving them any specific instructions asked them to write down all their assets and liabilities. Jay recalled that in his tax returns there were "loans to shareholders" (*i.e.*, loans from JJ-AIA to Jay) and the loans had been going up over the years, and he believed they equaled at least $350,000 by that time. Jay did not have the company's tax returns to see what the actual number was and worried it might be more than $350,000, so added $100,000, making the amount $450,000, "just to be safe." When they finished writing down everything they could think of, they gave the list to Reeder who asked if the list was correct to the best of their knowledge and they responded "yes". Reeder prepared the bankruptcy schedules and asked the Debtors to sign them. The Debtors briefly looked over the items listed to see that they agreed with what they had written down, and signed the Schedules. The Debtors never argued Reeder was responsible for the error; Jay admitted he made the error.

### 2.   The meeting of creditors and the production of tax returns; Gonzalez's retention of DesJardins, Fernandez & Smith; no objection to the Debtors's discharge

#### a.   The meeting of creditors and the production of tax returns

##### (1)   The first meeting of creditors

84.   The 11 U.S.C. § 341(a) meeting of creditors commenced May 8, 2001. Of singular importance was the questioning regarding the $450,000 shareholder loans from JJ-AIA to Jay reported in the Bankruptcy Schedules. Gonzalez specifically asked Jay to produce the most recent tax returns for JJ-AIA, explaining he needed "to review the documents" and stressing "I need you to give me every document you can find regarding

the transfers for the $450,000." The reason for requesting the company tax returns was to verify the amount of shareholder loans. Lapides attended the meeting, represented by Jason Tsai, who also inquired about the shareholder loans.

### (2)    The Debtors produce the requested tax returns and Gonzalez and Lapides discover the error

#### (a)    The Debtors produce the requested tax returns

85.    At the first meeting of creditors Jay indicated he had obtained an extension of time to file the company's 2000 tax return. Shortly after the meeting, Jay received the 2000 tax return, signed it, and immediately delivered it to Gonzalez together with the company's 1999 tax return. These two tax returns were delivered to Gonzalez *before* the second meeting of creditors on June 12, 2001.

86.    In his General Case Status Report filed January 21, 2009, Gonzalez reported that "[o]n or about May 31, 2001, the Debtors produced a number of the requested documents (financial statements, bank statements, canceled checks, *tax returns* …)" (emphasis added). Gonzalez then stated that "the meeting of creditors was continued in order to investigate the produced information …." Importantly, Gonzalez only asked for JJ-AIA's tax returns, not the Johnsons's personal returns.

#### (b)    Gonzalez and Lapides discover the error

87.    Taking Gonzalez at his word that he wanted to verify the amount of shareholder loans to Jay Johnson, as required by his duty as trustee, the 1999 tax return indicated loans to shareholders had decreased from $27,946 in 1998 to $20,915 in 1999, and the 2000 tax return indicated loans to shareholders had further decreased in 2000 to $17,500. Jay's tax preparer had been reducing, not increasing, the amount of shareholder loans over the past few years, but Jay was cognizant of that fact.

88.    Gonzalez unquestionably knew the figure of $450,000 in the Bankruptcy Schedules was not correct. The mistake obviously did not bother Gonzalez as he never confronted the Debtors with the error and because the error made no difference in the Debtors's reported net worth.

37

---

### (3)   The continued meeting of creditors

89.   The meeting of creditors continued June 12, 2001. Lapides again attended the meeting, represented by Tsai. Lazaro E. Fernandez of DesJardins, Fernandez & Smith, LLP, Gonzalez's "proposed bankruptcy counsel," attended the meeting and examined the Debtors.

90.   Prior to the meeting the Debtors produced the JJ-AIA tax returns requested by Gonzalez. This was confirmed by Gonzalez at the beginning of the meeting when he stated: "This is a continuation, and documents were produced, I have no further questions." Specifically mentioned during the meeting was the production of documents regarding JJ-AIA and the shareholder loans to Jay, and Fernandez questioned Jay regarding the profits of JJ-AIA and the shareholder loans to Jay.

91.   The production of documents by the Debtors prior to the meeting was further attested to on March 25, 2003, when Gonzalez filed a Motion to Extend Deadline under Section 546 of the Bankruptcy Code to Initiate Adversary Proceedings against Randy Johnson, Q Financial, and JJ-AIA ("Motion to Extend Deadline"), in which Gonzalez stated in his declaration in support of the motion: "I continued the initial May 8, 2001 meeting of creditors in order for the Debtors to produce a number of documents. ... Pursuant to my request the Debtors produced a number of documents such as bank statements, financial statements, [and] bank returns ...." Gonzalez continued the meeting of creditors so he could "investigate the produced information," and when the meeting was held there were no questions asked about missing documents or the insufficiency of the documents produced, and no additional documents were requested. Gonzalez was given what he asked for and he was satisfied with what he received.

### b.   Gonzalez's retention of DesJardins, Fernandez & Smith

92.   On September 13, 2001, Gonzalez filed his Application for an Order Authorizing the Employment of DesJardins, Fernandez & Smith, LLP, as General Bankruptcy Counsel for the purpose of "investigation of the debtors' assets, liabilities, transfers, and dealings". On September 27, 2001, the court approved the application.

38

### c.    Gonzalez has no objection to the Debtors's discharge

93.    In his trial declaration, Gonzalez stated that "as a condition precedent to receiving a discharge of indebtedness, the Debtors in this case were required to demonstrate forthrightness and honesty throughout their chapter 7 bankruptcy case, including voluntary disclosures of financial information provided on their bankruptcy Petition, accompanying Schedules, and in their dealings with me as their chapter 7 Trustee." Gonzalez was obviously satisfied the Debtors met the condition precedent to receiving their discharge. Having conducted his own investigation, and having employed the DesJardins firm to also investigate the matter, and neither Gonzalez nor the DesJardins firm finding anything amiss with the Debtors, including the fact that the loans to shareholders was known to be in error, no objection to their discharge was noted, and on November 6, 2001, the Debtors received their discharge.

94.    Gonzalez took no action because "[w]hile the Trustee and his counsel conducted an initial investigation of possible assets of the estate, the Trustee was not successful in recovering the required evidence in order to justify the commencement of a voidance action." Gonzalez's statement is a judicial admission he lacked evidence to file suit, even though the amount of shareholder loans was in error.

### D.    Lapides's Grim Determination to have Gonzalez Sue the Johnsons

95.    Lapides's enmity toward the Johnsons was no doubt exacerbated by the court finding him to have willfully violated the automatic stay and sanctioning him. Quickly following that debacle was Gonzalez's decision not to object to the Debtors's discharge because he lacked evidence to file suit. The proceedings from that point forward demonstrate Lapides's grim determination to cajole Gonzalez into suing the Johnsons and having the Debtors's discharge revoked.

39

1.   **Lapides's retention of Teresa A. Blasberg and the Motions to Conduct FRBP 2004 Examinations; the Motion to Extend Deadline; the Debtors's Motion for a Protective Order; and the examination of Randy Johnson**

    a.   **Lapides's retention of Teresa A. Blasberg and the Motions to Conduct FRBP 2004 Examinations**

        (1)   **Lapides's retention of Teresa A. Blasberg**

96.   On November 26, 2001, obviously dissatisfied with Gonzalez's decision not to object to the Debtors's discharge, and equally dissatisfied with Luna's failure to extricate him from the contempt proceeding, Lapides replaced Luna as his attorney with Teresa A. Blasberg. However, no action was taken for the next fifteen months, except Lapides sued Luna in Los Angeles Superior Court.

        (2)   **The Motions to Conduct FRBP 2004 Examinations**

97.   From November 2001 to February 2003, Gonzalez apparently gave no further thought to the case, and the Debtors believed they had finally rid themselves of Lapides. Gonzalez declared in his declaration in support of the Motion to Extend Deadline: "In February 2003, Ms. Blasberg and I had, *for the first time*, a number of direct communications regarding possible pre-petition transfers of properties of the estate. Based on those conferences, I agreed with Ms. Blasberg that further investigation was necessary in this case" (emphasis added). Gonzalez then concluded: "Information was provided, *for the first time* in February 2003, to me raising a suspicion of possible transfers by the Debtors prior to and during their bankruptcy filing" (emphasis added).

98.   On March 3, 2003, nearly two years after the Debtors filed for bankruptcy, Lapides filed motions for FRBP 2004 Examinations of Randy Johnson, the Custodian of Records of Q Financial, the Custodian of Records of the LDS Church, the Custodian of Records of JJ-AIA, and Jay Johnson. The motions were supported by Lapides's false and misleading declarations.

99.    First, Lapides declared he believed the Viro Road Property "belongs to the Debtors" because Jay allegedly "told me that he was making the mortgage payments on the Viro Road Property," and on another occasion in June 1999 Jay "told me that he could borrow against the Viro Road Property to pay my judgment if I would discount the debt." The statements were false and preposterous on their face—if the Debtors were trying to hide the property from Lapides they would never have told him they were making the mortgage payments and could borrow against the property.

100.    Second, Lapides declared that at the first meeting of creditors Jay "testified that he personally spent between $50,000 and $100,000 for the cost of building a second story onto the Viro Road Property …." There is no mention of "building a second story onto the Viro Road Property" at the first meeting of creditors, and the Viro Road Property was not discussed at all at the continued meeting of creditors.

101.    Third, Lapides declared that in 1990 the Debtors granted him "an option to acquire approximately four acres of adjacent property located at 5485 La Forest Drive … *which did have water available*," but that, "instead of honoring the option, the Debtors allowed the property to be foreclosed by the lienholder" (emphasis added). What this had to do with any fraudulent transfer is not explained, but it is an example of how brazen Lapides is in his lies. Water was not available on the adjacent property, everybody knew it, and getting water on all the La Forest Drive Properties was what the June 8, 2000 Agreement was all about. If water had been available in 1990, there would have been no bankruptcy ten years later. Based on these lies the court granted the motions.

### b.    The Motion to Extend Deadline

102.    On March 25, 2003, Gonzalez filed the Motion to Extend Deadline to give Lapides and Blasberg time to find "the required evidence in order to justify the commencement of a voidance action." Apparently, Gonzalez was still not persuaded by the "evidence" Lapides produced to justify the Motion for FRBP 2004 Examinations, but was willing to give him a chance to find the evidence sufficient to justify bringing suit. On

41

March 31, 2003, the court granted the Motion extending the time to initiate adversary proceedings from April 4, 2003 to June 4, 2003.

### c.    The Debtors's Motion for a Protective Order

103.    The Debtors brought a motion for a protective order to vacate the granting of the motions as to Jay Johnson and JJ-AIA. The court granted the motion, vacated the prior orders regarding Jay and JJ-AIA, and ordered there would be no examination and no production of documents from them.

104.    As shown above, the Debtors produced all documents requested at the meeting of creditors, and Gonzalez never again asked for documents until after he sued Randy Johnson (see below). Now it was Lapides that wanted documents, and the court denied his request.

### d.    The examination of Randy Johnson

105.    The FRBP 2004 examination of Randy Johnson was taken by Blasberg on April 29, 2003, and although Gonzalez stated he would "attend the examination of Randal Johnson" and "review the documents requested as part of the examination," Gonzalez arrived late and left almost immediately thereafter.

### 2.    Lapides's and Gonzalez's retention of James A. Hinds, Jr.

106.    The court having issued a protective order in favor of the Debtors, the Debtors gave no testimony and produced no documents. The only FRBP 2004 Examination that occurred was that of Randy Johnson, and he refused to answer most questions or to produce documents at that time (subsequently, after the entry of a protective order in favor of Randy and Robin Johnson, they answered all questions put to them by Hinds and produced all documents requested). Thus, at the conclusion of the effort by Lapides and Blasberg, Gonzalez had nothing more than he had to begin with—he still did not have "the required evidence in order to justify the commencement of a voidance action." Nonetheless, in his trial declaration, Gonzalez testified that "[a]fter examining with my counsel certain documents provided by the Debtors and Randy Johnson ... I determined that the Estate possessed enough information to support a good faith

Complaint against Randy Johnson ….” Gonzalez was more truthful in 2003 than he was in 2014. In 2003 Gonzalez represented to the court that the reason he did not take action earlier was because he did not have the evidence to justify filing suit; and, indeed, he took no action for two years. That is inconsistent with what he represented to the court in 2014. At trial Gonzalez represented to the court that “[a]fter examining with my counsel certain documents *provided by the Debtors and Randy Johnson* … I determined that the Estate possessed enough information to support a good faith Complaint against Randy Johnson …” (emphasis added). Because the Debtors and Randy Johnson did not produce any further documents, it is obvious Gonzalez was not candid with the court at the time of trial.

107.   Blasberg was plainly not willing to go forward, so Lapides found James A. Hinds, who was. The deadline for filing a complaint was June 4, 2003. Although there was not “enough evidence in order to justify the commencement of a voidance action,” the complaint was filed June 2, 2003, with Blasberg as Gonzalez’s attorney, but only his attorney for a moment. On June 13, 2003, Lapides signed an agreement with Hinds to pay the fees associated with the action, and on August 18, 2003, Gonzalez, Blasberg, and Paul Shankman of the Hinds firm signed a substitution of attorney.

E.    **Threats and Misrepresentations**

1.    **Threats**

a.    **The threat to make Randy Johnson’s life “a living hell”**

108.   Randy and Robin answered all Hinds’s questions and produced hundreds of documents, none of which proved Jay Johnson engaged in any kind of fraud. Hinds then met with Randy and made it clear to him that it was his brother, Jay, not Randy, that was the target of Gonzalez’s efforts. Hinds then threatened Randy that if he did not give testimony and deliver documents to Hinds that proved the case against Jay, Hinds was going to make Randy’s life “a living hell.” Hinds referred to this conversation in an e-mail dated May 26, 2004, in which Hinds stated: “I know that you and Paul [Shankman] have had a lot of talks about these matters but now that I’m back I am concerned that you

haven't produced enough to merit me not doing exactly what I told you I was prepared to do to make your life a living Hell." Hinds proceeded to make good on his threat.

### b.    Threats of criminal prosecution and financial ruination

109.    Between mid-July and mid-August, 2004, in violation of the discharge injunction, Lapides telephoned Jay Johnson on several occasions demanding the Debtors pay him the sum of $1,200,000, and threatened that unless payment was made he would have their discharge revoked, instruct Hinds to file criminal charges against he and Debbie, report them to the IRS, the US Attorney, and the Los Angeles County District Attorney, and they would "go to jail for a long time," Jay's career would be ended, and they would be financially ruined by having criminal records. Although Lapides's threats greatly disturbed and distressed them, Jay and Debbie refused to cave in to Lapides's extortion demands.

110.    On July 30, 2004, Hinds and Lapides spoke with J. Scott Bovitz, the attorney for Randy Johnson. Hinds stated he was going to speak with Reeder, the Debtors's attorney, and demand the sum of $1,200,000 for the Bankruptcy Estate, and threatened that unless the demand was accepted Gonzalez would file a complaint to revoke the Debtors's discharge, make a referral against Jay Johnson under Title 18 of the United States Code for hiding assets of the Bankruptcy Estate and making false statements on the Bankruptcy Schedules, and would report Jay to the IRS for tax fraud and get a finder's fee of ten percent.

111.    In a letter to Reeder and Bovitz dated October 22, 2004, Lapides stated he had received "a copy of a Settlement Offer dated Aug. 12, 2004 prepared by the trustee's attorney. … In this Settlement Offer, the trustee's attorney stated that if the terms were agreed to that this could avoid the requested referral of these matters to the Office of the United States Trustee and then to the U.S. Attorney, and that no contact would be made with the Internal Revenue Service regarding the apparent conduct of Jay and Debra Johnson." The settlement offer was rejected and on September 22, 2004, Gonzalez II was filed.

44

### 2.    Misrepresentations

#### a.    Misrepresentation re: discovery cutoff

112.   On May 31, 2006, present counsel substituted in as counsel for Jay and Debbie Johnson in Gonzalez II. On June 14, 2006, counsel telephoned Hinds to introduce himself. During this conversation with Hinds and Shankman, in response to counsel's inquiry regarding further discovery they each responded that the discovery cutoff date was May 30, 2006, and there could be no further discovery. In a follow-up letter from Hinds dated June 16, 2006, Hinds reaffirmed that "Discovery is closed …". A few days later, on June 21, 2006, Hinds also told Randy Johnson the discovery cutoff date had passed and no further discovery could take place. Hinds obviously was trying to take advantage of new counsel not having the files in hopes he could deter counsel from conducting further discovery.

113.   When new counsel received the complete file from prior counsel he learned that Hinds had misrepresented the discovery cutoff date. The date was not May 30, but was July 31, 2006. Counsel then noticed several depositions, including the deposition of Randy Johnson. On July 18, 2006, Hinds wrote counsel, asserting spurious reasons why counsel could not take Randy Johnson's deposition and threatened to seek sanctions against him if he proceeded. Threatening sanctions became a common tactic on Hinds's part throughout the litigation. On July 20, 2006, counsel wrote back to Hinds, first rebuking him for attempting to mislead counsel as to the discovery cutoff date, and then explaining why it was proper to take the deposition of Randy Johnson. There was a further exchange of letters the following day, July 21, 2006, in which Hinds did not deny telling counsel the discovery cutoff was May 30th, but retorted by saying counsel suffered a "self inflected wound" (sic) by not reviewing the files.

#### b.    Misrepresentation re: temporary restraining order

114.   On June 16, 2006, Gonzalez filed a complaint against Randy and Robin Johnson ("Gonzalez III"), alleging the existence and breach of a settlement agreement

between Gonzalez and Randy and Robin Johnson. Randy and Robin brought a motion for summary judgment which was granted by the court.

115. When Hinds filed Gonzalez III, he sought a temporary restraining order and preliminary injunction against Randy and his former attorney, Bovitz, to prevent Bovitz from returning $25,000 to Randy which was then in Bovitz's trust account. Randy was then *pro per*, and Hinds sought to take advantage of Randy at a time when he did not have an attorney—Hinds has an entry in his time records for June 12, 2006 reading: "Telephone call from R. Lapides re taking advantage of the loss of counsel and options."

116. On June 30, 2006, the court granted the temporary restraining order restraining Randy from taking possession of the $25,000 held in Bovitz's trust account. In preparing the proposed Order, Hinds attempted to surreptitiously add language in the Order that the $25,000 "represent[ed] a down payment against the agreed to settlement sum of $75,000.00 with Rosendo Gonzalez ...." The added language was not true, Randy objected, and the court struck the false material from the Order.

### c. Misrepresentation re: preliminary injunction

117. The hearing on the preliminary injunction was continued by the court to July 25, 2006. On July 19, 2006, Hinds sent Randy an email in which Hinds attempted to mislead Randy regarding the hearing date: "I just want to confirm that we have no hearing scheduled for this month and that the hearing originally set by Judge Smith for 7/25 is off calendar. My notes show that the next hearing is set for 8/31. Is this correct?"

118. The hearing on the preliminary injunction had not been taken off calendar. Randy was not so easily tricked, and emailed Hinds: "that is not my understanding. i looked at her calendar yesterday and our hearing is on it."

### F. Suborning Perjury, Intimidation of Witness, and Bribery

119. At an early stage of the proceedings Randy Johnson asserted his Fifth Amendment right not to testify as to certain matters. New counsel scheduled his deposition for July 27, 2006, and it was known beforehand that Randy intended to answer every question he previously refused to answer.

120.    It was obvious Randy's testimony was going to hurt Gonzalez's case against Jay, and, so, on July 21, 2006, just a few days before Randy's deposition, Hinds sent Randy an offer of settlement, one of the conditions of which was that "the Trustee demands that you stand by your assertion of the 5th Amended (sic) at any future deposition or trial." That Hinds was looking to find ways to suborn perjury from Randy or to intimidate Randy into testifying against Jay and Debbie is clear from Shankman's entry in the firm's billing for June 5, 2006 referencing his and Hinds's conference to "discuss potential wedge issues to bring R. Johnson to the table against J. and D. Johnson." When Randy replied that he would not accept the offer, Hinds emailed Randy: "As far as we are all concerned on our side we are going to litigate the Hell out of this matter and the related matters with Jay next week and for the weeks to come." Hinds, again, made good on his promise.

**G.    Mediation and the Motion to Compel Settlement**

**1.    The mediation**

121.    To resolve matters, the parties engaged in a voluntary private mediation with Bankruptcy Judge Mitchel Goldberg as mediator. The Johnsons refused to settle for anything substantial until in the late hours of the evening of the second day Judge Goldberg pressured the Johnsons by repeating the threats made by Gonzalez, Hinds, and Lapides that if the Johnsons lost in court, Gonzalez would turn the matter over to the authorities and the Johnsons would be prosecuted and sent to jail. At that point, Debbie broke down crying, Jay relented, and a settlement was supposedly reached.

**2.    The preparation of the settlement agreement and the misrepresentations as to what was agreed**

122.    In the months that followed, utilizing the seventy-seven-page transcript of Judge Goldberg's recitation of the alleged settlement, Shankman prepared an extensive written agreement supposedly reflecting the terms and conditions of the settlement. With the advice of new counsel, the Johnsons believed the settlement was not binding or enforceable because of Lapides's duplicity during the mediation regarding the water issues and the undue coercion by threats of possible criminal prosecution, and because the

47

proposed agreement did not in fact reflect what was agreed to at the mediation and therefore there was no meeting of the minds on an agreement. Counsel also advised that the mediation discussions were privileged and could not be used to prove the existence of a settlement or the terms of a settlement.

123. When the Johnsons did not participate in drafting the settlement agreement, Gonzalez and Hinds arranged for a further mediation session with Judge Goldberg for June 9, 2006. The Johnsons, however, refused to attend the session or to continue with the mediation, and were now determined to try the case and prove their innocence and show that Lapides maliciously concocted his story about fraud to extort money from them.

124. Notwithstanding the refusal of the Johnsons to participate further in the mediation, Gonzalez, Hinds, and Lapides met with Judge Goldberg, and Shankman rewrote the settlement agreement, making significant revisions and adding terms and conditions decided upon at the June 9 meeting. Inexplicably, Judge Goldberg signed the following statement at the end of the agreement: "The Settlement Judge herein approves this document as reasonably reflecting the Settlement of the Parties recited in open Court, the Official Transcript of which is attached hereto as Exhbit (sic) '1' [the September 2005 seventy-seven-page transcript of Judge Goldberg's recitation of the alleged settlement] and which is incorporated herein as if set forth in full." Many of the provisions in the written settlement agreement were matters never discussed at the mediation attended by the Johnsons in September 2005, including provisions regarding Lapides's self-contained water-delivery system. It was a matter of serious concern that Gonzalez represented to the court that the Debtors's consent to the provisions in the written agreement regarding Lapides's undisclosed water system and numerous other matters were to be found in the transcript of the oral agreement—that simply was not true. The Johnsons refused to sign the agreement, and because the agreement was not signed and was not on the record before a judge with adjudicatory authority, it was clearly unenforceable.

### 3.    The motion to compel settlement

125.    When the Johnsons refused to sign the settlement agreement, Gonzalez and Hinds brought a motion to compel enforcement of the agreement, and on November 21, 2006, Bankruptcy Judge Erithe Smith granted the motion, but did not sign the order enforcing the agreement until April 12, 2007. The Johnsons immediately thereafter brought a motion for reconsideration, and on September 24, 2007, Judge Smith granted the motion for reconsideration and reversed her prior order, declaring the settlement agreement null and void. The enormous amount of time and effort and expense in opposing the motion to enforce the settlement and in persuading the court an error had been made in granting the motion was a travesty—the law on this matter was crystal clear and the motion to compel had to have been brought in bad faith.

126.    Perhaps the most disturbing part of the mediation process and the motion to compel was that Gonzalez and Hinds attached to the motion the entire seventy-seven-page transcript of the alleged agreement reached in the early hours of the morning of September 22, 2005. To add further to the violation of the law and ethics regarding mediation, Gonzalez and Hinds also attached to the motion the eighty-page transcript of the so-called mediation session held June 9, 2006, out of which came additional terms and conditions to the supposed settlement agreement. Although the Johnsons vigorously objected and warned Judge Smith she should not read the transcripts, the objection went unheeded and Judge Smith read the forbidden mediation transcripts. Counsel wrote Hinds and cited the law regarding the confidentiality of the mediation proceedings and in the strongest of terms objected to his use of the transcripts of the proceedings to dissuade him from filing his motion, but to no avail. Counsel's objection was met with a threat that if the Johnsons did not sign the agreement Gonzalez would bring a motion for sanctions for his having to move to compel compliance. The motion for sanctions was brought and denied.

127.    Clearly, the Defendants intended to prejudice Judge Smith against the Plaintiffs by showing their supposed agreement to pay a substantial amount in settlement, for no lawyer could believe in good faith that the mediation proceedings could be used to

49

prove a settlement. On the motion for reconsideration, Hinds was reduced to arguing inane propositions to support his giving the mediation transcripts to the court, including that the parties "invested Judge Goldberg with extraordinary powers to complete the agreement," "invested Judge Goldberg with additional powers as a Judge to complete the settlement," and "deputized" him with judicial authority to find and declare the terms and conditions of the settlement and granting him authority to arbitrate any disputes that remained or might arise in the future and authority to enforce the provisions of the settlement. It did not help that Judge Goldberg referred to himself as "the court" and the "final" and "sole arbiter" of issues and that there was a settlement "on the record" "in open court" (at midnight) and that he "reserved jurisdiction" over settlement terms and he would enforce the provisions of the settlement and sign the agreement for any party that refused to sign.

128.    Another disturbing part of the motion to compel is that Judge Goldberg apparently communicated directly with Judge Smith regarding the supposed settlement prior to the hearing on the motion. Hinds has an entry in his billings for August 10, 2006, which reads: "Confer with [Shankman] re … the e-mail from Judge Goldberg re his review of the Settlement Agreement *and communication direct to Judge Smith re same* …." A few weeks later on September 22, 2006, Hinds has another entry on his billing statement reading: "Telephone call from Judge Goldberg re getting the settlement approved by Judge Smith. E-mail [Shankman] re Judge Goldberg's call tonight…." The propriety of Judge Goldberg communicating directly with Judge Smith regarding "getting the settlement approved" is more than questionable, and it appears Hinds in effect had an *ex parte* communication with Judge Smith through Judge Goldberg.

**H.    The Threat of Criminal Proceedings and the Statement to Suppress or Destroy Evidence of Criminal Activity**

129.    On more than one occasion, Hinds threatened to "report" the Johnsons to the criminal authorities based on the "evidence" Gonzalez had gathered. In addition, Hinds openly stated that if the Johnsons would simply go along with the alleged settlement agreement (mentioned above and which was later found not to be enforceable), the

"evidence" of the supposed crimes would be destroyed. For example, on March 4, 2007, Hinds wrote counsel:

> Assuming that Randy's defense is being funded by others … the question still remains why would anyone continue to pay for the defense in our cases if there is literally no upside potential in the defense (other than perhaps avoid jail time on tax and Title 18 issues)? If the only thing we are fighting over is to keep Randy and Jay (and their family members) out of a federal facility due to what appear to be violations of Titles 18 and 26, there is a much more cost efficient way to make sure that all of the evidence developed by the Trustee to date (which is, in our opinion, substantial) is destroyed and that none of these documents are turned over to the federal prosecutors or investigators. I believe it when you said to Richard and Janis Lapides at your Rule 26 meeting last year that your primary motivation was "to keep your clients out of jail."[1] The Trustee sees little value in having the Johnsons charged with any criminal violations resulting from the investigation conducted to date and the facts uncovered. The Johnsons cannot fulfill their obligations under the settlement brokered by Judge Goldberg if they cannot work or the IRS and FTB assert priority liens.
>
> …
>
> Given what we see as significantly diminished returns to the Johnsons and the Trustee based on … the potential criminal fallout from the Trustee establishing his claims, … the Trustee's duty to report improper conduct to the Department of Justice and the U.S. Trustee's Office ….

---

[1] That was not true. Hinds was not at the Rule 26(f) meeting, thus Lapides must have told Hinds that counsel's "primary motivation was 'to keep [my] clients out of jail.'" Counsel never made any such statement. The Johnsons adamantly maintained that they were innocent of any alleged crimes. They steadfastly refused to compromise with Gonzalez or Lapides and have now proved the claims asserted were false.

51

130. The statements in Hinds's letter of March 4, 2007, were foreshadowed in earlier letters and court filings. For example, in Hinds's letter dated October 17, 2006, just prior to the hearing on the motion to enforce the alleged settlement agreement, he stated: "I would not be surprised if there are several governmental agencies taking a close look at the conduct of the debtors and the evidence developed by the Trustee over the past several years to determine if violations of Titles 18 and 11 occurred in this case."

**I.      Discovery, and the Defendants's Failed Attempt to Exclude Documents from Evidence**

131. Throughout the litigation, the Defendants accused the Plaintiffs of failing to cooperate in discovery and of refusing to produce documents. The accusations were false and made with the intent to deceive the court into believing the Plaintiffs were hiding evidence. There was never an instance where the Plaintiffs possessed a document that was requested and they refused to produce it. On the other hand, the Defendants made numerous attempts to suppress or exclude documents at trial on the sham basis they had not been produced timely. For one example (there are many more), Gonzalez attempted to exclude Q Financial's Union Bank monthly statements on three separate occasions, the last time being at trial where Lapides falsely testified he had just recently seen the documents when in fact he had known of their existence for ten years.

**1.      The production of the documents and their designation as an exhibit for trial and Lapides's acknowledgement of having the documents and there being no objection to them**

132. On May 26, 2004, Hinds sent Randy an email asking "where the Q Financial bank account information can be located." Randy responded: "you have the Wells Fargo statements [previously sent to Hinds]. before that, from 1997 to 1999, the bank accounts were at Union Bank in the Pasadena office. I don't have any records but am trying to obtain account numbers." The next day, May 27, 2004, Randy sent Hinds an email stating: "one positive note is that … the Q union bank account number was on a letter to a mortgage broker as part of my escrow package. so that … will be helpful." On May 29, 2004, Randy

52

sent Hinds another email stating: "I will focus now on getting … bank accounts that I am currently missing …." Subsequently, Randy found the original Union Bank statements of account and on June 7, 2004 sent Hinds an email stating: "I have more information to send you regarding transactions through Q in 2000. I will be putting this together with my other answers to questions." The bank statements were sent to Hinds and given to Lapides.

133.   On January 30, 2007, the Plaintiffs filed an Exhibit List for an earlier trial which identified the Q Financial Union Bank monthly statements as an exhibit. Counsel for the Plaintiffs delivered copies of all the exhibits to Hinds. On March 20, 2007, Hinds filed his motion *in limine* to exclude documents allegedly produced "well after the discovery cut off date," and in his declaration in support of the motion declared the documents produced by counsel for the Plaintiffs contained "a number of new, never before disclosed documents" and that he delivered the documents to Lapides for his review.

134.   In his declaration in support of the motion *in limine*, Lapides testified he had previously reviewed every document produced by the Plaintiffs and compared them with the proposed exhibits produced by counsel for the Plaintiffs and listed on their Exhibit List. Lapides then stated that the Union Bank monthly statements had previously been produced by the Plaintiffs and he had "no objection to their inclusion in the trial of this matter," identifying the bank statements as documents in their files.

### 2.    The first devious attempt to exclude the documents

135.   In August 2010, counsel for the Plaintiffs gave Hinds a proposed Joint Pretrial Statement which identified the Union Bank monthly statements as an exhibit, and Hinds filed a motion *in limine* to exclude the statements. In his declaration in support of the motion Hinds declared the statements had "never before [been] disclosed."

136.   On January 4, 2011, counsel for the Plaintiffs filed his declaration in opposition to the motion, attaching a chart prepared jointly with Hinds in which Hinds confessed, again, that the documents "were in the Trustee's files before the Discovery Cut-off Date; therefore there is no objection as to its timeliness." On June 15, 2011, the court

signed its Order regarding the motion *in limine*, in which the court did <u>not</u> include in the exhibits that could <u>not</u> be used the Union Bank monthly statements of account, meaning the documents could be used at trial.

### 3.    The second devious attempt to exclude the documents

137.    In preparation for the trial in 2014, counsel for the Plaintiffs sent Hinds a draft of the Plaintiffs's Exhibit List which identified the Union Bank monthly statements as an exhibit. Hinds again objected to the statements on the grounds that "[t]he purported original of this document was not produced by the [Plaintiffs] prior to the discovery cutoff date in the cause." Counsel for the Plaintiffs expressed his ire to Christina Keith, counsel assisting Hinds, and stressed he would not tolerate the assertion of this objection again and the matter would be brought to the attention of the court. Apparently, Keith prevailed upon Hinds because the objection was withdrawn and was omitted in the Revised Joint List of Exhibits submitted to the court for trial.

### 4.    The third devious attempt to exclude the documents and Hinds's false statements

138.    Counsel for the Plaintiffs was absolutely stunned at trial when Hinds objected to the Union Bank monthly statements on the ground they had not been produced timely and they had only recently been received. Counsel for the Plaintiffs pointed out that the objection was not listed in the Joint List of Trial Exhibits and Hinds made the statement that to get the Joint List filed he "dumbed down" the objections by leaving this objection out, but still insisted the objection stood. The court overruled the objection. Given the history of this issue the objection had to have been made in bad faith—Hinds could not possibly have forgotten the past battles; in fact, Hinds falsely represented to the court that the Plaintiffs had lost every single battle on this issue.

### 5.    Lapides adds his false testimony at trial

139.    During the argument at trial regarding this matter, Hinds made the false statement that the document was an "outlier," and in referring to Lapides's testimony which had just been given at that point in the trial falsely stated that Lapides had not seen

1   the document and therefore did not list it in his Report and counsel for the Plaintiffs should

2   realize Lapides cannot testify regarding the document because he had not seen it. Taking

3   his cue from Hinds, when Lapides was asked when he first saw the bank statements he

4   falsely testified: "I don't recall ever having seen this before;" he then modified that

5   somewhat by saying he may have seen the statements when the Joint Exhibit list was

6   prepared for the current trial. And asked one last time, Lapides testified he had not seen

7   the bank statements until just before trial, and knew nothing about the account. The next

8   day Lapides again testified falsely that this account had only recently been discovered.

9   Lapides testified he knew there was at least one other account (the Union Bank account)

10  that was not disclosed to the trustee. Lapides's testimony was patently false and clearly

11  given with the intent to mislead the court.

12         **J.    Gonzalez's False Testimony at Trial**

13         140.    There were several instances where Gonzalez testified falsely at trial. One

14  instance regarding mortgage interest payments is noteworthy.

15         141.    In his trial declaration under the heading "<u>Documents Which The Debtors</u>

16  <u>Failed To Provide To Me At The Inception Of This Chapter 7 Case</u>," Gonzalez stated that

17  "[t]he Debtors did **not** provide me with any information … that the Debtors were (and had

18  been) taking the owners' mortgage interest deduction on the mortgage payments on the

19  Viro Road Property" (emphasis in original). Gonzalez testified at trial he determined the

20  Debtors had been taking the mortgage interest deduction on the Viro Road Property. When

21  asked on cross-examination what evidence he had the Debtors had taken the mortgage

22  interest deduction during the time Randy owned the property, Gonzalez testified he

23  believed it was one or more tax returns provided by the Debtors. But that could not

24  possibly be true. The Debtors never took the mortgage interest deduction until after the

25  property was sold to Michael McFall in October 2001, months after the filing of the

26  bankruptcy. The Debtors's tax returns for 1996, 1997, 1998, 1999, 2000, and 2001, all

27  show the Debtors did <u>not</u> take the mortgage interest deduction. The Debtors's tax return

28  for 2002, after the sale of the property to McFall, is the only tax return showing the Debtors

taking the mortgage interest deduction, and that return is dated August 14, 2003. When confronted with these facts, Gonzalez backpedaled and said if it was not a tax return, it must have been something else—but there is nothing else that anyone has pointed to, nor could they since the Debtors never took the mortgage interest deduction during the time in question.

### K.    The Viro Road Property

142.    The Defendants contended the Debtors acquired the property at 4600 Viro Road ("Viro Road Property") in La Cañada as an asset and thereafter fraudulently transferred the property to Randy and Robin Johnson. This contention, as with all the Defendants's contentions in this case, rested entirely upon Lapides's so called expert reports and trial testimony. The evidence, however, made it crystal clear the Defendants had a predetermined conclusion regarding the issue and misstated, twisted, and fabricated facts to support the conclusion. There was no evidence to support the Defendants's position. The evidence proved just the opposite, *i.e.*, the Debtors were not the owners of the Viro Road Property. The evidence at trial and which was known to the Defendants before filing suit, was as follows:

#### 1.    Jay Johnson finds the Viro Road Property and Randy Johnson agrees to buy the property and rent it to the Debtors

143.    In early 1995, Jay and Debbie Johnson were told they would have to vacate the home they were renting on Gould Avenue. Jay found a home for sale at 4600 Viro Road he believed could be remodeled and would be a nice home for him and his family if in time they could acquire it. Jay and Debbie had little money and with the Lapides Judgment against them they had no credit to buy the house. Randy and Robin were renting, and Jay asked Randy if he would like to buy the house as his residence and sell it to Jay and Debbie at full market value if they were later able to afford it and Randy did not want to live in the house. It was agreed that if Randy decided to sell the house to Jay and Debbie, any appreciation in the value of the property would be Randy's and not Jay's, but that Jay

and Debbie could pretty much design and landscape the house as they liked since it was hoped they would eventually be able to buy the house.

144.   Jay explained the relationship between him and his brother Randy, testifying that he and Randy had been taught by their parents that if one of them needed help, and the other was able to give that help, they should gladly lend a helping hand. Over the years, Jay and Randy had always been there for the other in times of need. For example, Jay told of how Randy could not afford a car in college and so he gave him a car. At school, Randy was not focused on any path to graduation and Jay mentored him to a point where he graduated and went on to UCLA for his Masters Degree. Later Jay helped Randy find a home to buy on Castle Road which Randy later sold and earned a profit of approximately $150,000. Now that Jay and Debbie could not stay in the house on Gould Avenue, they needed help in getting their family settled in another home, and Randy gladly agreed to help because he was able to do so.

### 2.   Randy and Robin buy the Viro Road Property and Jay and Debbie rent it from the seller pending the close of escrow

145.   It was financially impossible for Jay and Debbie to buy the Viro Road Property; but it was possible for them to rent the property. On the other hand, it was relatively easy for Randy and Robin to buy the property and they were more than willing to rent it to Jay and Debbie.

#### a.   Jay and Debbie's financial standing in June 1995

146.   An obviously important factor in determining whether Jay and Debbie bought the Viro Road Property was whether Jay and Debbie had the financial capacity to buy the property.

#### (1)   Jay and Debbie had no assets

147.   Lapides conceded that whether Jay and Debbie had any assets at the time the Viro Road Property was purchased was a factor to be considered. It was then shown that Jay and Debbie had no assets.

57

148.    Jay testified that while he had been successful as an architect, and for the most part had been able to earn a good living, he and Debbie had never been affluent, and circumstances were such they were never able to accumulate much wealth. The evidence showed the following: Jay was broke when he finished college. He and Debbie married shortly thereafter and started a family. They put $30,000 of savings into buying the Oliver Property and lost $55,000 on the sale of the property to Lapides. In late 1990 they sold their house on Greenridge Drive for less than the amount owed on the mortgage and rented for the next five years. Earlier they had put $50,000 down to buy the La Forest Drive/Johnson Property, invested another $100,000 over the next few years in developing the property, and in early 1996 lost the property in a foreclosure. In May 1994, Lapides recorded a judgment against Jay and Debbie for almost $384,000, and in June, Jay and Debbie signed a note for $400,000 in favor of Lapides.

149.    Lapides admitted he had no evidence of any assets Jay and Debbie owned in June 1995: no real property other than the La Forest Drive Property which had no equity and was shortly thereafter lost in foreclosure; no stocks, bonds, or mutual funds; no precious metals, jewelry, paintings, objects of art, antiques, or collectables; no automobiles; and no cash or pension funds. In the end, Lapides admitted he did not know if in June 1995, Jay and Debbie had any significant assets.

150.    Lapides executed (wrongfully) on his judgment against Jay and Debbie's personal accounts and against JJ-AIA's account but got nothing and could find no other assets to levy against. It was so obvious Jay and Debbie had no assets in June 1995, that in his Reports Lapides did not even discuss the issue whether the Johnsons had any assets as of June 1995. Nor did Lapides discuss or even mention whether Randy and Robin had assets at the time.

### (2)    Jay and Debbie had no credit

151.    Lapides conceded his judgment against Jay and Debbie Johnson alone would have adversely affected their credit worthiness and that with no credit it would have been virtually impossible for Jay and Debbie to buy the Viro Road Property. Lapides said he

COMPLAINT

1   did not know whether any of the Johnsons were creditworthy and did not consider the

2   issue, and he ignored the issue in his Reports.

3           **b.**   **Randy and Robin's financial standing in June 1995**

4      152.  Randy Johnson obtained his MBA from UCLA in 1983. From 1983 to 1986

5   he was employed by Kidder, Peabody & Company in Los Angeles and New York as a

6   Fixed Income/Financial Futures Specialist. From 1986 to 1989 he was employed by

7   American Savings Bank in Irvine, California, becoming Executive Vice President, Chief

8   Investment Officer, and Head of Trading. From 1989 to 1993, he was employed by

9   LOR/Geske Bock Associates in Los Angeles as Vice President and Manager, Financial

10   Institutions Division. And from 1993 to 1997, he was employed by Fidelity Federal Bank,

11   FSB ("FFB"), in Glendale, California, holding the positions of Treasurer, Chief

12   Investment Officer, Head Trader, Asset/Liability Manager, Structured Finance Manager,

13   Secondary Market Manager, and Interest Rate Risk/Hedging Manager. Randy was a

14   highly-compensated bank officer; there was no evidence to the contrary, and Lapides

15   ignored Randy's financial status in his Reports.

16           **c.**   **Randy and Robin sign the purchase agreement**

17      153.  Lapides agreed that knowing who signed the purchase agreement would be

18   an important factor in determining who bought the Viro Road Property. That was so

19   because the person signing the contract would be the person obligated to perform and

20   would be the person held liable or responsible for breach of the contract. The Real Estate

21   Purchase Contract and Receipt for Deposit for the Viro Road Property was signed by

22   Randy and Robin, obligating them to perform pursuant to the terms and conditions of the

23   Contract and in the event of their breach making them liable for the broker's commission,

24   loss of their deposit up to three percent of the purchase price as liquidated damages (almost

25   $10,000), and attorney's fees and costs. Randy and Robin were also obligated to (1) act

26   diligently and in good faith to obtain a loan, (2) make a $10,000 deposit and an additional

27   $22,500 down payment, (3) obtain a $292,500 first loan, (4) pay a total purchase price of

28   $325,000, and (5) obtain a prequalification letter from a lender within ten days. Further,

59

Randy and Robin had to close escrow within 90 days and were liable for one-half the escrow fees. Jay and Debbie did not sign the Contract, undertook none of the obligations in the Contract, and could not be held liable for breach of the Contract. Lapides testified he took none of these items into consideration in rendering his opinion and none of them were discussed in his Reports—for obvious reasons.

### d. Randy and Robin pay the $10,000 cash deposit

154. The Escrow Closing Statement shows a cash deposit of $10,000. Lapides agreed that knowing who made the deposit would be an important factor in determining who bought the property. Lapides further agreed that the Purchase Contract and Receipt for Deposit recites that Randy and Robin made the $10,000 cash deposit by personal check. The Johnsons all testified Randy and Robin made the deposit and Lapides admitted he had seen the check written by Robin Johnson to make the deposit and there was no evidence the money used to pay the check came from Jay or Debbie Johnson.

### e. Randy and Robin's offer was a back-up offer

155. The Purchase Contract, dated June 23, 1995, provides that the $10,000 check is to be held uncashed until "the next business day after acceptance of the offer, or upon written cancellation of escrow #6630-2." The Contract of Purchase is a printed form which provides for the cancellation of a prior sale and a back-up offer, and identifies the current offer as the back-up offer for the Viro Road Property. The only evidence regarding the first offer was Jay's testimony that "Randy's offer was a back-up offer," and the offer "was not an offer from Debbie or me—we never made an offer to buy the property."

### f. Mitchell accepts Randy and Robin's offer and Jay and Debbie rent the house pending the close of escrow

156. Randy and Robin signed the Contract of Purchase on June 23, 1995, and Mitchell accepted the offer on June 27, 1995. Jay testified that "[a]fter Mitchell accepted Randy's offer to purchase the property, he accepted our offer to lease the property." The Lease agreement between Jay and Debbie and Mitchell provided for rent of $1600 per month.

COMPLAINT

1

     **g.**  **Randy and Robin pay the additional $55,250 deposit**

2    157. The closing statement shows an additional deposit of $55,250. Again,

3 Lapides admitted that knowing who made the deposit would be an important factor in

4 determining who bought the Viro Road Property. Lapides testified he did not know who

5 wrote the check for the $55,250 deposited into escrow, and did not know from which bank

6 account the balance of the funds came from. Randy testified that he and Robin deposited

7 an additional $55,250 into escrow, and that none of the money came from Jay or Debbie.

8 Jay and Debbie both testified that Randy and Robin deposited the $55,250 into escrow,

9 and that none of the money came from them.

10     **h.**  **Lapides's incompetence as an expert on the Viro Road**

11        **Property transaction**

12    158. Nowhere is Lapides's incompetence as an expert demonstrated more clearly

13 than with respect to his opinion regarding the import of the $10,000 cash deposit for the

14 purchase of the Viro Road Property. In his Report Lapides declares that if Jay was renting

15 and not buying the property the $10,000 cash deposit in escrow would be shown on the

16 closing statement as a credit to the buyer. The escrow closing statement shows the $10,000

17 deposit credited to the buyer. Lapides's Report also accurately reflects that fact: "The

18 Closing Statement confirmed that $10,000 was indeed deposited into escrow, and this

19 $10,000 was credited to the 'Buyer' towards the $325,000 Sales Price." Thus, according

20 to Lapides's hypothesis, because the $10,000 deposit was credited to the buyer, Jay was

21 renting the property. Notwithstanding the inescapable conclusion applying his hypothesis,

22 Lapides concluded just the opposite: "This discussion pretty well establishes that the

23 debtor himself paid at least this $10,000 towards the down payment of the Viro property!"

24    159. Lapides's reasoning is incomprehensible. There is no connection between

25 the deposit being credited to the buyer and Jay's renting the house. Nor can it be explained

26 by saying Lapides made an error and he really meant the seller, as opposed to the buyer,

27 would be credited with the $10,000 deposit if Jay were renting the property. That can easily

28 be demonstrated: The totals at the bottom of the closing statement must match, as they do

1   in this case, each reflecting the sum of $627,750. If the $10,000 deposit is moved to the

2   opposite column, the closing statement would reflect $237,750 debited to Randy and

3   $617,750 credited to Randy and the closing statement would be $20,000 out of balance.

4   None of this mattered to Lapides as he concluded: "Even if we had no other evidence, just

5   these facts alone indicate that the debtor had at least an **'undisclosed equity position'** in

6   the 4600 Viro Road property." No reasonable trustee in bankruptcy or attorney could

7   possibly rely upon this kind of testimony as proof of fraud.

### 3. Randy retains JJ-AIA for architectural work

#### a. The contract for architectural work

10   160.   On August 12, 1995, Randy and Robin retained JJ-AIA to do the architectural

11   work on the Viro Road Property, and paid a retainer fee of $2,000. An invoice from JJ-

12   AIA to Randy and Robin dated November 16, 1995, shows an amount paid to date of

13   $19,000, with a balance owing of $2,000.

#### b. The plan checking fee

15   161.   In his Report, Lapides referred to an Application for Building Permit and

16   stated that a "Building Permit fee of $1,941.43 was paid by check #1642 by the city from

17   the debtor *Jay Johnson* on 10-11-95" (emphasis in original). Although Lapides contended

18   he was an expert in reading this type of document, his expertise failed him—the $1,941.43

19   was not for the Permit Fee but was for the Plan Checking ("P.C.") fee, and he did not know

20   what the initials "P.C." meant. The Application identifies Randy as the owner of the

21   property and Jay as the architect or engineer. The Application further reflects that the check

22   for the Plan Checking fee was received October 11, 1995, that on October 17, 1995, the

23   architect requested the county "hold off p.c. [plan checking]", that the "go ahead w/p.c."

24   was given December 27, 1995, and approved January 19, 1996.

25   162.   Neither the Application nor the Fee Receipt for the payment of the plan

26   checking fee shows whose check was given for the fee. Lapides admitted he had not seen

27   the check and did not know who issued the check, and did not even know if it was Jay that

28   presented the check. Lapides also admitted he was not an architect and had no knowledge

of how architects run their business or whether architects advance money for the payment of fees such as for plan checking fees. Jay testified that he often advanced costs for his clients, such as plan check fees, and would certainly have done so for his brother.

### 4.    Randy obtains a construction loan

163.    The Purchase Contract required the buyers, Randy and Robin, to obtain a loan in the amount of $292,500. Lapides admitted that knowing who signed the note would be an important factor in determining who purchased the property.

### a.    Preliminary steps to obtaining the loan

164.    Randy negotiated a construction loan from Keros-Mozilo Mortgage Bankers (the "Keros-Mozilo Loan"), and on December 7, 1995, Keros-Mozilo sent instructions to Inter Valley Escrow that it wanted a note, deed of trust, and an ALTA Policy showing the property vested in Randy and Robin, husband and wife, as joint tenants. A Supplemental Sheet to Escrow Instructions required the borrowers, Randy and Robin, to provide Inter Valley Escrow with a cashier's check for the balance of the borrower's funds in the amount of $52,235, and the escrow Closing Statement shows a cash deposit of $52,250. As pointed out above, Randy testified he made the cash deposit, Jay and Debbie testified they did not make the deposit, and Lapides agreed there was no evidence that Jay made the deposit.

165.    Keros-Mozilo also wanted the architect contract and copies of paid receipts for services. Lapides acknowledged the contract between JJ-AIA and Randy and Robin as the contract required by Keros-Mozilo, and the JJ-AIA invoice as the paid receipt required by Keros-Mozilo.

166.    The Supplemental Sheet to Escrow Instructions also required that a tax lien be paid. Lapides admitted he had no evidence Jay paid the tax lien.

167.    The Supplemental Sheet to Escrow Instructions also required a signed Description of Materials List. Lapides had no idea what that document was and when shown the HUD Description of Materials form had no idea what that form was. Jay testified that on November 15, 1995, appropriately as the architect for the project, he signed the HUD form identifying the materials to be used in the construction and

1  remodeling of the home. Lapides admitted he was not an expert on contracting or

2  architectural matters and did not know whether Jay properly or improperly signed the form

3  as architect.

### b.    The granting and selling of the loan

4

5  168.   Randy and Robin signed the note for the construction loan. Lapides admitted

6  that Randy and Robin's signing the note was an important factor to consider in determining

7  who purchased the Viro Road Property. It was Lapides's firm opinion, though, that Jay

8  paid the principal and interest payments on the loan. The evidence proved the loan was

9  paid by Randy (see below). Lapides further admitted that if Jay refused or was unable to

10  pay the loan Randy and Robin were at risk they would have to pay the loan.

11  169.   The note provided it could be transferred or sold, and it was sold to

12  Independent National Mortgage Company ("INMC") (hereafter the "INMC Loan"). In his

13  Report, Lapides stated Jay "paid all of the … construction loan payments thereby paying

14  for the second-story addition". Lapides testified that from all the evidence he reviewed he

15  determined Jay paid all the principal and interest payments on the construction loan.

16  Lapides did not and could not produce any evidence showing Jay paid the principal and

17  interest for the simple fact that the loan included an interest reserve out of which the

18  interest payments were made and, as will be seen below, the principal was paid by a take-

19  out loan from Downey Savings and Loan (the "Downey Loan"). Again, no reasonable

20  trustee in bankruptcy or attorney could possibly rely upon anyone with such a lack of

21  understanding of these types of matters.

22  170.   The loan statement dated August 31, 1996, showed the interest reserve was

23  exhausted and INMC requested payment in the amount of $4,313.34. On September 11,

24  1996, Randy wrote INMC requesting an extension of the loan and asked that the matter

25  be expedited because they were ready for another disbursement.

26  171.   On September 19, 1996, Randy wire transferred $25,000 from Bank of New

27  York to his account at Fidelity Federal Bank ("FFB"). This account was designated by

28  Randy as the "Viro Construction Account." Randy's schedule of rent and mortgage

COMPLAINT

payments shows Randy making the interest payments to INMC for the months of September, October, November, and December 1996, out of the Viro Construction Account at FFB, and Lapides agreed the entries for the loan payments indicate Randy was the person making the loan payments from his FFB checking account.

172.    On September 26, 1996, Randy and Robin signed a Modification Agreement with INMC extending the construction loan from September 9, 1996 to November 9, 1996. The Modification Agreement specifically provided that before the extension would be granted, Randy and Robin had to pay delinquent interest in the amount of $4,313.34 and an extension fee of $500. Randy's payment schedule shows that on September 20, 1996, a check issued on the FFB Viro Road Construction Account to pay the two amounts required.

173.    On September 30, 1996, INMC sent Randy an interest billing statement for interest due October 1, 1996, in the amount of $4,331.78. Randy's schedule of payments reflects Randy paid the interest with check no. 123 drawn against the FFB Viro Construction Account dated October 17, 1996. The schedule of payments further reflects Randy paid interest to INMC in November and December 1996, at which time the construction loan was paid off with a permanent loan from Downey Savings (see below).

### 5.    Completion of construction

174.    In his Report, Lapides notes Jay signed the Notice of Completion as the owner or corporate officer of named owner or his agent on October 15, 1996. Lapides admitted he did not conclude Jay was the buyer of the property from this document. He further admitted Jay could be signing the document as the agent for the owner, Randy, and signed the verification as the manager, and admitted he had no expertise to state whether such a document could or could not be signed by Jay in those capacities.

### 6.    The Downey Savings Loan

175.    Lapides admitted knowing who applied for the permanent or take-out loan would be an important factor in determining who purchased the Viro Road Property. Lapides knew Randy testified he was the one who negotiated the loan with Downey

65

Savings. Randy testified further he paid the $300 application fee for the loan, which is reflected on his schedule of payments.

176.    The Design Escrow, Inc. Borrower's Closing Statement reflects Downey Savings was making a loan to Randy in the sum of $620,000 to be secured by a first deed of trust on the Viro Road Property. Lapides admitted it was significant the escrow statement reflected that Randy was the borrower on the loan.

177.    The Closing Statement reflects, and Lapides acknowledged, loan proceeds in the amount of $562,500 were used to pay off the principal amount of the INMC Loan, plus $9,097.33 in interest and a few dollars for fees and a late charge. The Closing Statement reflects, and again Lapides acknowledged, the balance of the loan proceeds in the amount of $43,250.49, were to be paid to Randy, and he testified he had no evidence the loan proceeds did not go to Randy. Lapides recalled Jay testifying he did not get the money, and Lapides admitted he had no evidence any of the money went to Jay. All the evidence points to Randy paying the principal and interest on the construction loan; there is no evidence Jay paid anything on the construction loan. All the evidence points to Randy receiving the balance of the loan proceeds in the amount of $43,250.49; there is no evidence any of that money ever went to Jay.

### 7.    Randy pays the mortgage, etc, and Jay pays rent to Randy

178.    Jay and Randy's agreement regarding rent on the Viro Road Property was that Jay would essentially pay Randy his out-of-pocket expenses. In his Report, Lapides stated that a review of Randy's schedule of payments "revealed that Jay Johnson actually reimbursed his brother Randy Johnson for each and every mortgage payment, real estate tax payment, and insurance premium on the 4600 Viro Rd. property for the entire time the Viro Road property was in the name of Randal Johnson" (emphasis in original). The evidence showed Jay actually fell short in his payments, and while it was agreed that Jay would pay Randy his out-of-pocket expenses, Lapides's statement was false in at least two aspects: (1) Lapides admitted at trial his statement was not correct because the schedule did not cover the entire time period during which Randy owned the property, and (2)

66

Lapides admitted he did not have evidence of every payment supposedly made by Jay and therefore could not show Jay made every mortgage payment (see below).

### a.    Rent from September 1996 to December 1996

179.   Jay and Debbie had moved out of the house shortly after escrow closed in December 1995 so construction could begin on the remodel. Because Jay was not living in the house during construction up to September 1996, no rent was paid to Randy and Lapides had no evidence to the contrary (although, as pointed out earlier, Lapides had stated in his Report that Jay started paying Randy rent in December 1995). With construction of the remodel almost complete, Jay and Debbie moved back into the house in September 1996 and began for the first time paying rent approximately equal to Randy's out-of-pocket expenses.

180.   Randy kept a running schedule of payments from September 1996 to April 1998. Randy's schedule of payments shows Jay making payments approximately equal to the construction interest payments for the months of September through December 1996, at which time the construction loan was paid by Randy. Lapides agreed that the schedule of payments kept by Randy was consistent with the agreement between Jay and Randy.

### b.    Rent from January 1997 to April 1998

181.   Lapides agreed the Downey Savings payments began in March 1997, and there were no loan payments to Downey Savings for January and February. Because Jay's arrangement with Randy was to pay Randy his out-of-pocket costs, there being no out-of-pocket costs for those two months Jay made no payments to Randy.

182.   The schedule of payments shows the payments made by Randy to Downey Savings and for taxes and insurance, and the payments made by Jay to Randy from March 1997 to April 1998. Lapides agreed the schedule shows Jay was not making payments directly to Downey Savings, and he further agreed Jay was paying Randy and Randy was making separate payments to Downey Savings for that period.

67

### c.   Rent for 1998-2001

183.   Lapides claimed he could prove Jay made matching payments for every payment Randy made on the Viro Road Property. Randy's schedule ended with April 1998. When asked where he had evidence Jay made matching payments for 1998-2001, Lapides could produce no evidence.

### d.   The alleged $10,000 fraudulent rent check issued by JJ&A

184.   A glaring and stunning example of Lapides's duplicity was his claim and testimony that Jay Johnson issued a $10,000 fraudulent check against the JJ&A account for Jay's rent of the Viro Road Property. Lapides's multiple lies regarding this transaction were exposed in cross-examination and left Lapides with no credibility whatsoever.

185.   In the Table of Contents to his Report, Lapides identifies several examples of alleged bankruptcy fraud committed by the Johnsons. Prominent among them is one entitled "$10,000 Fraudulent Rent Check Issued by JJ&A." This transaction was a notorious item highlighted and repeated in numerous places in Lapides's Report. For example, at one place Lapides states (emphasis in original): "… As previously noted and discussed, JJ&A issued a check on **12-30-2002** to Randal Johnson for $10,000 with a Memo stating: "Viro rent". … This check just seems to be a very very (sic) poor and superficial attempt by the debtor and his co-conspirator[s] [Randy Johnson and Michael McFall] to somehow try to verify that Jay Johnson was renting 4600 Viro Road property from his brother Randy Johnson."

186.   Lapides was asked if he had ever seen either the original or a copy of the check, and he responded "no." Asked how he knew it was a check drawn on JJ&A's account for $10,000 payable to Randy if he had never seen the check, Lapides referred to the supposed JJ&A 2002 Financial Reports (not admitted into evidence) that supposedly identified a check issued December 30, 2002, payable to Randy Johnson in the amount of $10,000 with a memo reading "viro rent." Lapides testified most emphatically he had checked out numerous transactions recorded in the Financial Reports and there was no question in his mind, no doubt whatsoever, that there was a $10,000 check issued by JJ&A

payable to Randy Johnson which contained the memo "viro rent." It was pointed out to Lapides that the entry in the Financial Reports did not contain a check number, but that did not dissuade him. Lapides recognized the Financial Reports as having been prepared using Quick Books, which he said he was familiar with, and when asked if the check number would not also be entered he responded, "sometimes yes, sometimes no;" he did admit, though, to be complete the check number would also be entered.

187.    Lapides stated it was not necessary for him to look at the bank statement of account to see if the check was paid because he had satisfied himself that the Quick Books record was accurate. He was then asked to look at the bank statement and it was pointed out to him that there was a $10,000 wire transfer that day to an entity in Idaho, but nowhere was there a check paid for $10,000. When asked to find in the bank statements where the supposed check for $10,000 was paid, he was at a complete loss. When asked if it was still his opinion there was a fraudulent check for $10,000 issued against the JJ&A account to Randy with a memo stating "viro rent," Hinds, seeing the obvious problem, tried to come to Lapides's rescue by objecting that counsel had misrepresented Lapides's testimony and that Lapides had never called it a check. The effort fell flat on its face when it was again pointed out that Lapides specifically called it a check numerous times in his Report, and nobody could have forgotten Lapides called it a check umpteen times in the last few minutes. When asked again if it was still his opinion that Jay, Randy, and McFall participated in a fraud by issuing a $10,000 check against the JJ&A account with a memo reading "viro rent," he responded without hesitation "yes." This testimony occurred at the end of trial on Friday, February 28, 2014.

188.    At the beginning of the second week of trial on Tuesday, April 22, 2014, Lapides was again referred to the Table of Contents to his Report and the reference to the alleged fraudulent $10,000 rent check. He was then directed to a section of his Report where he listed the check among other checks he said were issued for the benefit of Jay Johnson, and further directed to that section of his report quoted above. Counsel then asked Lapides if during the past seven weeks he had found the check, and Lapides responded

1    "no," and when asked if he looked for the check Lapides testified he had reviewed the
2    issue thoroughly and looked for the check but did not find it.

3         189.   Counsel asked Lapides how he knew the check was issued by Jay Johnson if
4    he had never seen the check, and Lapides said the check had been issued by JJ&A. When
5    it was pointed out that in his Report he stated the check had been "issued by Jay Johnson,"
6    Lapides said he made an error.

7         190.   Lapides explained he matched 200 to 300 checks listed in the Quick Books
8    record of checks with checks paid in the bank statements and determined the Quick Books
9    record was accurate, and because the entry for the $10,000 check in the Quick Books
10   record did not have a number he did not look in the bank statements for that check. After
11   again referring Lapides to the bank statement showing a $10,000 wire transfer on
12   December 30, 2002, Lapides in effect recanted his testimony that there was a $10,000
13   check and said that if he had noticed it earlier he would have characterized it as a wire
14   transfer for the benefit of Randy Johnson.

15        191.   Counsel challenged Lapides as to when he looked at the bank statement and
16   discovered the $10,000 payment was a wire transfer and not a check. Lapides testified it
17   was after the first of week of trial he researched the issue and when counsel pointedly said
18   to him "You did it before the trial, didn't you," Lapides responded "no," and stated that if
19   he had seen it earlier he would not have put it in his Report or testified as he did the first
20   week of trial. Lapides was then shown his Reply Report prepared October 3, 2007, in
21   which he identified the $10,000 transaction as a wire transfer to Randy Johnson for "Viro
22   rent." Lapides then admitted that between the time he wrote his first Report and the time
23   he wrote his second Report he did discover it was a wire transfer. When confronted with
24   his testimony at the first week of trial where he testified he was absolutely 100% sure it
25   was a check, Lapides said he did not remember calling it a check, but that if he did it was
26   a mistake. Lapides's testimony that he did not remember calling it a check a few weeks
27   earlier was just another bald-faced lie in a series of bald-faced lies. No reasonable trustee

28

in bankruptcy or attorney would tolerate a witness who obviously could not and would not testify to the truth.

### 8. Lapides's bad faith claims regarding Jay's alleged payments for additional Viro Road Property expenses

#### a. Bad faith claims regarding construction expenses

192. To support his predetermined conclusion that Jay and Debbie Johnson were the real owners of the Viro Road Property, Lapides compiled a list of items he testified were paid by Jay for work, services, or goods related to the Viro Road Property, which totaled $81,172.19. The first item listed is the contract between JJ-AIA. and Randy Johnson for the architectural services for the remodel of the home on the Viro Road Property. The original fee for the architectural services was $20,000. In his letter to Downey Savings dated December 16, 1996, Jay indicated the architectural fees were $21,000, reflecting an apparent addition of $1,000, and Lapides used the $21,000 figure. Lapides then stated that Jay "traded services" in that amount, which was confirmed by Jay. Because Jay traded the $21,000 in fees owed for rent on the Viro Road Property, Lapides cannot count the $21,000 in fees as "additional" expenses paid by Jay on the property—Lapides could only count the fees if Jay did not trade services and paid the rent, and Lapides never proved Jay paid the rent.

193. The second item on Lapides's list is $13,150 for plants obtained from West Coast Nursery used in landscaping the Viro Road Property. Lapides states these goods were also traded for services rendered by Jay to West Coast Nursery, which Jay also confirmed. Jay billed the amount of these goods to Randy, and Jay stated Randy gave him rent credit for this amount. Thus, whether Randy paid Jay for the goods or gave Jay rent credit for the goods, Lapides cannot count the goods as "additional" expenses paid by Jay on the property—Lapides could only count the goods if Jay was not paid and was not given rent credit, and Lapides never proved Randy did not pay Jay or give him rent credit.

194. The third item on Lapides's list is $20,000 for construction costs incurred with Paynter Construction and which Lapides again says was traded with Jay for

---

1  architectural services. Jay billed the construction costs to Randy. Thus, whether Randy

2  paid Jay the construction costs or gave Jay rent credit for the costs, Lapides cannot count

3  the costs as "additional" expenses paid by Jay on the property—Lapides could only count

4  the costs if Jay was not paid and was not given rent credit, and Lapides never proved

5  Randy did not pay Jay or give him rent credit.

6      195.   For the remaining $27,022.19 of "additional" costs Lapides claims were paid

7  by Jay on the Viro Road Property, Lapides gathered together several checks payable to

8  contractors and others and without verifying anything to do with the checks testified they

9  were for work, services, or goods related to the Viro Road Property. His testimony was

10  patently dishonest.

11      196.   Lapides testified many of the checks were for construction work on the Viro

12  Road Property, including checks payable to Paynter Construction, Gopher Construction,

13  Behr Construction, Uprising Construction, Architectural Lighting and Design, Brankers

14  and Associates, David Anderson, and David K Arnold Construction. It made no difference

15  to Lapides that some checks were drawn against Jay's personal account and others against

16  JJ-AIA's account—to Lapides they were all Jay's personal funds. Lapides's testimony

17  was simply speculation and made in bad faith.

18      197.   Jay testified there was no way to tell whether the checks to Paynter

19  Construction were for work on the Viro Road Property because Paynter "did a lot of

20  projects for myself and clients." As to the other payees (Gopher, Behr, Uprising,

21  Architectural Lighting, Brankers, Anderson, and Arnold) Jay testified they did not work

22  on the Viro Road Property.

23      198.   Lapides admitted he did not know David Paynter, was not present when the

24  work was performed, did not talk to Paynter about the work, never asked Paynter for an

25  invoice or work order for the work, did not know where Paynter was located, never looked

26  for an address or telephone number for Paynter, never spoke with anyone he knew worked

27  for Paynter, and when the questioning came to an end admitted he did not know whether

28  Paynter did any work on the Viro Road Property.

199.   The same type of examination with the same kind of responses took place with respect to the checks payable to Behr Construction, Gopher Construction, Uprising Construction, Garden's, Inc., G&G Air Conditioning, Architectural Lighting, Brankers and Associates, Hickmet, David Anderson (although a check was deposited to a credit union in Idaho and another check was deposited to an account at Beehive Credit Union in Rexburg, Idaho, Lapides still maintained that David Anderson did work on the Viro Road Property in California), and Arnold Construction. At the end of questioning, Lapides admitted that some of the checks could have been for work performed on projects other than the Viro Road Property. Questioned further Lapides admitted there were some checks he was not certain about. Lapides admitted it would have been helpful in rendering his opinion if he had documentation, such as invoices, work order, etc., or if he had spoken with the people supposedly doing the work, but he did not do that.

### b.    Bad faith claims regarding interior design services

200.   Lapides listed several checks totaling $9,210.63 which he testified were for interior design work on the Viro Road Property. Again, as with the payees of the checks for construction work, Lapides never spoke with the payees of the checks issued for the supposed interior design work and never saw any paper work for the services supposedly rendered. Lapides admitted he did not know who ordered the work. Lapides also admitted that if a tenant buys furniture, the owner would normally not pay for it, and he did not know if the checks at issue went to buy furniture. Lapides was speculating what these checks were for, and his insistence they were for interior design was a bad faith assertion on his part.

### c.    Bad faith claims regarding pest control services

201.   Once a year for five years the Johnsons spent $68 on pest control services. Lapides stated that in his expert opinion only the owner pays for those services and because Jay paid for the services he was the owner of the Viro Road Property. That was the kind of evidence the Defendants put forward to prove the Plaintiffs guilty of fraud.

73

### 9.   Randy Out-Spends Jay by a Considerable Amount

202.   Lapides agreed that part of the search as to who was the true owner of the Viro Road Property was to examine the comparison between what Jay may have paid toward the property and what Randy paid toward the property, and the more money Randy paid the more likely Randy was the owner. Lapides agreed that if Randy paid the $10,000 down payment and the additional $55,000 down payment and paid other money toward the purchase of the property, that would indicate Randy was the owner, and the more Randy spent on the property the stronger the indication Randy was the owner. The evidence at trial showed that if Jay was the owner of the Viro Road Property, he owed Randy more than $200,000 because that was the amount Randy spent on the property over and above what Jay paid Randy.

### L.   The Frame 10 Productions Loan

203.   The Defendants contended that Jay Johnson owned the Viro Road Property and withdrew the "equity" in the property through a loan made by Frame 10 Productions. The Defendants then contended that the proceeds of the Frame 10 Productions Loan were deposited into the Q Financial account and used to purchase the La Forest Drive Property in 2001 and therefore Q Financial was Jay's company, not Randy's company, and the La Forest Drive Property was an asset of the Bankruptcy Estate that the Debtors failed to disclose. As shown above, the Viro Road Property was purchased by Randy Johnson, and the evidence showed that Randy Johnson borrowed money from Frame 10 Productions secured by a deed of trust on the Viro Road Property. The evidence also showed Q Financial was Randy's company, not Jay's company, and Lapides could not trace the funds from the Frame 10 Productions Loan to the purchase of the La Forest Drive in any event.

204.   The Note for the Frame 10 Loan is dated June 5, 2000, and is signed by Randy Johnson as the borrower. Lapides admitted Randy was obligated to pay the note, and if there were a default under the Note, Randy alone would be liable for the breach. Lapides further admitted he was unaware of anything that indicated Jay guaranteed payment of the Note.

74

1   205.   The Defendants contended Jay repaid the Frame 10 Loan, but there was no

2   evidence that was the case; rather, the evidence showed Randy repaid the loan. When the

3   loan was paid, the Defendants tried to trace part of the funds from McFall back to Jay, but

4   there was no evidence to support the allegation and the evidence showed no funds ever

5   ended up with the Debtors.

6   **M.    The La Forest Drive Property**

7   **1.    The purchase of the La Forest Drive Property**

8   206.   The Defendants argued that the La Forest Drive Property purchased in 2000

9   was owned by the Debtors but not included in their Bankruptcy Schedules and was part of

10   the fraud practiced by the Debtors on their creditors. Like the purchase of the Viro Road

11   Property, there was no evidence to support the allegation the Debtors purchased the La

12   Forest Drive Property; rather, the evidence proved Randy was the purchaser.

13   207.   On June 12, 2000, Q Financial made an offer to purchase the La Forest Drive

14   Property for $675,000, and Randy signed the offer in behalf of the company. On June 12,

15   2000, Randy signed Q Financial's check payable to Coldwell Banker for $25,000, and

16   Escrows For You receipted for the payment. The Q Financial record of transactions

17   regarding the purchase of the La Forest Drive Property showed the issuance of the check

18   on June 12, 2000 payable to Coldwell Banker for $25,000 for the deposit on the purchase

19   of the property, and a reference of a payment to Escrows For You on August 29, 2000 in

20   the amount of $212,339.02. The Escrows For You Buyer Final Settlement Statement dated

21   August 31, 2000, reflects the two payments of $25,000 and $212,339.02, and also reflects

22   Randy is the buyer of the property. Lapides did not know how Randy, as the buyer of the

23   property, could treat the disbursement of funds from Q Financial, but because the funds

24   deposited into escrow came from Q Financial, an LLC, Randy could treat the funds as

25   either a loan or a disbursement to him.

26   208.   The Settlement Statement shows that the purchase price was $720,000. The

27   Grant Deed shows the property was taken in the name of Randy Johnson, a married man

28   as his sole and separate property.

75

209.   To purchase the property, Randy signed a note to IndyMac Bank in the amount of $500,000, payments to be made in the amount of $5,047.05 secured by a Deed of Trust in favor of IndyMac. Lapides admitted Randy was the only person liable on the note and the person responsible for any breach of nonpayment. Robin Johnson signed an Interspousal Transfer Grant Deed with respect to the property. First American Title Insurance Company issued a Policy of Title Insurance on the property naming Randy as the insured.

### 2.   Profit or loss on the project

210.   Lapides testified there was a profit made on the sale of the La Forest Drive Property. Asked if he did some kind of analysis to determine if there was a profit or loss on the property, Lapides testified he looked only at the closing statement which indicated a few hundred thousand dollars received from the sale. Asked if he ever made a determination whether there was a profit or loss on the sale of the property, Lapides said it was not his assignment to make a valuation of the property, and it did not matter to him. Asked what he would do to determine if there was a profit or loss, Lapides said he would look at the opening and closing escrow statements. Lapides testified that the escrow statement for the purchase of the property would indicate how much was paid for the property, and the escrow statement for the sale of the property would indicate how much the property sold for. Lapides continued to refer back to a tax audit and had no real idea how to determine whether there was a profit or loss on the property, and in his opinion it really did not matter.

### a.   Purchase costs incurred by Randy: $17,012.63

211.   The Escrows For You Buyer Final Settlement Statement for the purchase of the La Forest Drive Property shows purchase costs of $18,163.99 with a tax adjustment of $1,151.36 for a total of $17,012.63 in purchase costs (interest is in a different category (see below)). Lapides agreed these costs should be considered in determining whether there was a profit or loss on the project.

76

### b.    Development costs incurred by Randy: $6,815

212.    In his Report, Lapides stated that Jay paid for the development costs on the project from a hidden account that Jay controlled. Lapides acknowledged there were certain development costs, and he contended Jay paid the costs out of some hidden account, which he identified as the JJ&A account. Lapides agreed these costs should be considered in determining whether there was a profit or loss on the project. There was no evidence JJ&A was Jay's company; rather, the evidence proved JJ&A was Randy's company.

### (1)    Development costs incurred by Randy paid by Q Financial: $4,835

213.    Randy's record of costs on the La Forest Drive Property showed checks signed by Randy totaling $4,835, and Lapides agreed these would be costs expended that should be taken into account in determining if there was a profit or loss on the project. Randy was proved to be the owner of Q Financial, and the owner of the La Forest Drive Property. Development costs paid by Q Financial for the project would be accounted for as either a loan or a disbursement to Randy, however he chose to account for them.

### (2)    Development costs incurred by Randy advanced by JJ&A: $1,980

214.    Certain checks signed by Randy were paid for expenses on the La Forest Drive Property out of the JJ&A account, and Lapides agreed these would be costs expended that should be taken into account in determining if there was a profit or loss on the project. As indicated, the evidence proved Randy was the owner of JJ&A. Lapides testified he did not have the expertise to opine on whether a company, such as an architectural company, might advance costs for a client and seek reimbursement for those costs. However, in today's world it does not take an expert to recognize that most businesses advance costs for their clients and seek reimbursement. In this case JJ&A was retained to do the architectural work on the project and advanced costs to its client, Randy, the owner of the La Forest Drive Property.

77

1    **c.    Mortgage payment costs incurred by Randy: $40,702.79**

2    215.  Lapides agreed interest costs expended should be taken into account in

3    determining if there is a profit or loss on the project.

4    **(1)    Interest on IndyMac Loan at time of purchase:**

5    **$326.39**

6    216.  The Escrows For You Buyer Final Settlement Statement for the purchase of

7    the La Forest Drive Property shows an interest charge of $326.39.

8    **(2)    Interest plus principal on IndyMac Loan incurred by**

9    **Randy and paid by Q Financial: $40,376.40**

10   217.  Randy's records of costs on the La Forest Drive Property showed interest

11   plus principal payments to IndyMac totaling $40,376.40. Randy could treat these

12   payments from Q Financial as either a loan or as disbursements, his choice.      .

13   **d.    Randy runs out of money by May 2001**

14   218.  With the dot.com bubble burst, Randy lost all his money. With no money,

15   Randy was unable to continue with the project and Jay had no money to pick it up.

16   **e.    The transfer of the La Forest Drive Property to JJ&A**

17   219.  On November 14, 2001, Randy transferred title to the La Forest Drive

18   Property to JJ&A. Lapides testified that Randy transferred the property to JJ&A "for zero

19   (0) consideration." In his Report, Lapides stated a number of times that "[a]fter the

20   purchase, the property was transferred to a 'hidden' corporation controlled by the debtor

21   (JJ&A) for zero '0' consideration." Lapides testified that the transfer of the property to

22   JJ&A was one of the most significant and important events leading him to conclude that

23   the Johnson brothers had committed fraud. The subject of Randy's transferring the

24   property to JJ&A for zero consideration took on even greater meaning in his Reply Report

25   where he discussed it no less than sixteen times.

26   220.  In his trial declaration, Lapides testified that based on his work "as a **senior**

27   Internal Revenue Service **analyst**" he was "familiar with the rule[s] and regulations

28   pertaining to personal and business tax returns" (emphasis in original). However, Lapides

78

testified he only had a "superficial" understanding of the rules and regulations pertaining to personal and business tax returns, and further testified he had never heard of nor had any understanding of a Section 351 transfer of property. Asked several questions about IRC 351 transfers, it became obvious he had no idea what they were.

221.  Lapides was shown the year 2001 tax return for JJ&A, indicating the address on the return was Randy's home address on Pontiac Street in La Crescenta, and asked if JJ&A was operating out of Randy's house. Of course, he said no. It was further pointed out the tax return was signed in behalf of JJ&A by Randy, as president, not by Jay, and the return was prepared by Milam, Randy's CPA, not Sy or Swick, Jay's tax preparers.

222.  Lapides was then directed to the Statement With Respect to IRC Sec. 351 Transfer attached to the tax return. The first sentence of the statement was read to Lapides: "Pursuant to IRC Section 351 and the regulations promulgated there under ... the sole shareholder in exchange for stock, transferred real property to the JJ&A solely in exchange for stock," and was asked what he understood that sentence to mean. Lapides replied: "That sentence is an indication of a potential fraud because JJ&A was already owned by Randy 100 percent, how could he get more stock than 100 percent. So that's another red flag—sentence you just read. ... A big red flag."

223.  Asked if he had ever heard of a company issuing additional stock, Lapides answered yes. Asked if Randy owned 100 percent of the stock of JJ&A, and transferred the equity in the La Forest Drive Property to JJ&A, could Randy not just issue additional stock, he replied "it doesn't make any sense," "that's one of the two red flags" in the statement. Asked what his understanding was of the transaction, he repeated what he said numerous times in his Reports: the property was transferred for zero consideration.

224.  Lapides testified he did not seek any help in understanding what the IRC Section 351 statement meant because he considered it inconsequential. Asked if it would have been a prudent thing to do if he did not understand the statement, he testified "no." It is incomprehensible how a competent bankruptcy trustee or reasonable attorney could try to prove fraud by someone who knew so little about the subject matter at issue.

**f.      Mortgage payments incurred by JJ&A: $30,282.30**

225.   The IRC 351 Statement stated the transfer of the La Forest Drive Property from Randy to JJ&A occurred in May, 2001, and as shown above, Randy made the mortgage payments *via* Q Financial through May 2001. The JJ&A bank statements showed checks for the mortgage payments thereafter totaling $30,282.30.

**g.      Interest paid IndyMac on sale of the La Forest Drive Property: $3,735.77; total interest paid IndyMac in 2001: $60,755.63**

226.   The California Executive Escrow Services, Inc. Seller Final Settlement Statement for the sale of the La Forest Drive Property by JJ&A to Michael O'Leary shows interest charged on the IndyMac Loan of $3,735.77. The IndyMac Mortgage Interest Statement issued for 2001 shows total interest paid in 2001 of $6,755.63.

**h.      Costs of sale of the La Forest Drive Property: $45,421.73; taxes paid: $4,411.10**

**(1)     Costs of sale: $45,421.73**

227.   Lapides agreed the sales costs would also have to be taken into account in determining whether there was a profit or loss on the project. The California Executive Escrow Seller Final Settlement Statement shows the costs incurred in the sale of the property. The interest charge of $3,735.77 is ignored because it is already included in the IndyMac Mortgage Interest Statement referred to above. Excluding the payment of taxes, which is put in a different category (see below), the total sales costs charged to JJ&A are in the amount of $45,421.73.

**(2)     Taxes paid: $4,411.10**

228.   The California Executive Escrow Seller Final Settlement Statement shows taxes paid and charged to JJ&A in the amount of $4,411.10. Lapides also agreed this charge would also have to be taken into account in determining whether there was a profit or loss on the project.

i.     **Loss on the La Forest Drive Property: ($89,558.80)**

229.   The loss on the La Forest Drive Property which would have been suffered by Randy except for the IRC 351 transfer to JJ&A and which therefore was suffered by JJ&A is ($89,558.80). The Escrows For You Buyer Final Settlement Statement for the purchase of the La Forest Drive Property by Randy shows a purchase price of $720,000. The California Executive Escrow Seller Final Settlement Statement for the sale of the La Forest Drive Property by JJ&A shows a sales price of $775,000. The difference between the two shows a potential profit of $55,000, but subtracting the costs expended on the project of $144,558.80 shows a loss of ($89,558.80). Lapides agreed that if the figures are correct, there would be a loss on the La Forest Drive Property project.

230.   The IRC 351 Statement attached to JJ&A's year 2001 tax return indicates a loan of $500,000, and Lapides agreed that if it was an interest only loan there would have been no reduction of principal. The IRC 351 Statement indicates a net equity of $222,338 in the La Forest Drive Property. The California Executive Escrow Settlement Statement shows net proceeds upon sale of the property of $223,789.58. The difference between the two figures is $1,451.58. The difference between the two figures can be explained as follows: By amortizing the $500,000 loan from the beginning of the loan to May 2001 when the transfer was effective between Randy and JJ&A per the IRC 351 Statement, the principal is reduced to $498,530.96. The difference between the $500,000 which Milam assumed was the balance of an unamortized loan and the balance of $498,530.96 which was the balance of the loan amortized is $1,469.04. The difference of $17.46 can easily be accounted for by the bank's computer going out more decimal places.

j.     **Receipt of the proceeds of the sale of the La Forest Drive Property**

231.   The JJ&A bank statement shows JJ&A received the proceeds of the sale of the La Forest Drive Property on November 23, 2001.

**N.    JJ&A's Loan to Lawrence Gillins**

232.   The Defendants tried to bring in yet another conspirator, Lawrence Gillins, also a member of the LDS Church in La Cañada and friend of the Johnsons. Randy signed JJ&A's check dated December 7, 2001, for $200,000 payable to Lawrence Gillins. In his Report, Lapides states Gillins signed a note for the $200,000 loan "***ONE MONTH AFTER*** the $200,000 check … was received by Gillins …" (emphasis in original)), arguing there was fraud involved and an effort to cover it up. This would make Gillins a conspirator. Asked what evidence he had Gillins signed the note one month after receiving the check, Lapides testified it was about a month after the date of the check that Gillins signed the note—he had no other evidence. Lapides's testimony was pure speculation as to when Gillins received the check. The reverse of the check reveals it was paid January 3, 2002, and the JJ&A bank statement shows the check was paid January 3, 2002. Although unlikely Gillins would hold the check for a month before depositing it, Lapides stubbornly testified it made no difference—the check was received a month before the note was signed.

233.   Lapides testified he traced the funds from the sale of the La Forest Drive Property to the check issued to Gillins by looking at the date the proceeds of the sale of the La Forest Drive Property went into the JJ&A account, and the date the check to Gillins was paid, and since they were somewhat close in time, he concluded the proceeds of the sale went to Gillins. In tracing the funds Lapides admitted he made no effort to apply the first-in/first-out methodology or any other methodology to trace the funds. If Lapides had applied the first-in/first-out method, he would have discovered that only $161,391.37 of the proceeds of the sale of the La Forest Drive Property went into the $200,000 Gillins check.

234.   Asked if he traced the funds after they ended up with Gillins, Lapides said "yes," the $200,000 was used to make the purchase on December 27, 2001 of the two San Juan properties and the Carmel property purchased by Gillins. Questioned as to how Gillins could have spent the $200,000 in December when he did not get the money until

82

January, Lapides said that now that was pointed out to him, Gillins must have used other funds and "refreshed the funds" he spent with the $200,000 check. Lapides tried to excuse himself by saying it was not critical or important. Lapides admitted it was impossible to have purchased the properties with the $200,000 check since it was not paid until after the purchase, but when asked to admit his prior statement that the funds from the check were used to purchase the properties was incorrect he said "no." Lapides obviously has no concept of what it means to trace funds.

235.   Lapides was referred to Gillins's trial declaration where Gillins stated he made a payment on the note of $50,000 in July 2004, and subsequently paid the balance of the note. Lapides, who testified he believed Gillins was credible, honest and truthful, testified he had no evidence or information that would allow him to trace the funds from the $200,000 check back to JJ&A. In the next breath, Lapides said he did have a basis for tracing the funds back to JJ&A. In questioning him about that, Lapides admitted he had not seen any of Gillins's bank statements. Asked if he knew what Gillins did with the $200,000, he said "yes," he refreshed his account after buying the property earlier, but could not answer the question as to what Gillins did with the money. Lapides's testimony is sheer nonsense and demonstrates once again that Lapides had a predetermined conclusion, in this case that the money could be traced back to JJ&A, and nothing was going to change his mind, including the facts.

236.   In his Report, Lapides stated that Jay Johnson "admitted at his deposition that he had a 30% ownership interest" in L.G. Development, LLC (a company formed by Gillins (see below)). Jay never testified he had an interest in L.G. Development, and Gillins testified Jay never had an interest in L.G. Development.

237.   In his trial declaration, Gillins testified he formed L.G. Development, LLC on December 26, 2003. Lapides, asked how he could testify that Jay Johnson testified he had a thirty percent interest in a company in December 2001 that was not formed until December 2003, could not answer the question, because to do so would be to admit he lied. Gillins stated in his trial declaration that he was the only person who had an

83

1   ownership interest in the company until 2008, when his wife had an interest in the

2   company. He testified that at no time did Jay or Debbie or Randy or Robin ever have an

3   interest in the company.

4       238.   Lapides alleged throughout his Reports that Jay received hundreds of

5   thousands of dollars from the sale of the homes at 311 San Juan Way and 4810 Carmel

6   Road, and that Jay was living in the home at 317 San Juan Way rent free for a year before

7   buying the house. Gillins completely refuted Lapides's allegations, testifying in his trial

8   declaration that the profit on the two homes sold "was extremely low," and that, pursuant

9   to their agreement, Jay "paid the costs of purchasing the lot and building the house together

10  with ten percent interest on the costs," and that "[e]ven though Jay moved into the house

11  before he could obtain financing and close the escrow on the sale, and did not pay what

12  would be called 'rent' during that period of time, the interest on the costs continued to

13  accrue which exceeded any fair amount of rent that would have otherwise been paid at the

14  time."

15  **O.      The Canyon Meadows Property**

16      239.   Jay Johnson did not have the money nor could he obtain a loan to purchase

17  and develop the Canyon Meadows Property so, in accordance with his practice, he

18  approached a local developer he knew in La Cañada by the name of John Mahli about

19  financing the project. After they both saw the property, Mahli said he wanted to be Jay's

20  partner and that he would put up the money to purchase and develop the property, and he

21  reimbursed Jay for the initial $25,000 deposit. Jay was to be the architect and manager of

22  the project. Later, Mahli decided he did not want to continue with the project and Jay

23  Johnson signed a note to Mahli for the $25,000 he had reimbursed him for the deposit. Jay

24  needed a new partner, and put together two investor groups: one group of investors in Utah

25  formed a limited liability company for their investment, and a second group of investors,

26  consisting of Randy Johnson, Joseph N. Burk, Jay Johnson's father-in-law, Dean

27  Hemstreet, Frank and Jenette Hill, Debbie Johnson's sister and her husband, and Jessica

28  R. Alsop, the wife of a friend living in Utah (the "Canyon Meadows Investors"), formed

84

a second limited liability company called Canyon Meadows Investors, LLC ("Canyon Meadows LLC"), for their investment of about $200,000. The two investment companies formed a third limited liability company to purchase the project. Jay and Debbie Johnson had no interest in any of the three companies. However, Jay had an agreement with the Canyon Meadows Investors, that he would manage the project and share in any profits generated by the project, and he disclosed this agreement on the Bankruptcy Schedules. The project later ran into serious problems and eventually the property was sold and the Canyon Meadows Investors lost their investment, and there were no profits to share. Jay Johnson was unable to pay the note to Mahli, and listed the debt on the Bankruptcy Schedules. At trial, the Defendants accused Jay and Debbie of conspiring with the Canyon Meadows Investors to defraud the bankruptcy court and the creditors of the Bankruptcy Estate, and, in particular, Lapides, by failing to disclose the Debtors alleged interest in Canyon Meadows LLC and its value from Gonzalez.

240.    In his Report Lapides states that the property was purchased in 1993 for approximately $200,000 with "only a $500 mortgage note payable shown at the end of 1999," and concluded that "it is certainly indicated that there exists a profit potential," although Lapides had no facts to support his statement. Lapides then states: "If we estimated +12% annual appreciation from 9-1-1993, the subject property would have an estimated value and equity of approx. $300,000 as of the BK filing date." When asked where he got the 12% annual appreciation rate, Lapides launched into one of his long non-responsive dialogues, at which point he was asked: "It's not your job to speculate is it?", and after several more attempts to get him to answer the question, including the court repeating the question, in response to the specific question, "As an expert in this case it's not your job to speculate is it?", he stated: "I do make reasonable speculations and estimations as part of this job." Lapides could give no basis for using a rate of 12%.

241.    Lapides then states that "[i]f the debtor's (sic) interest [in the Canyon Meadows LLC] was 50%, this would equate to an estimated equity of approx. $150,000 as of the BK filing date." When asked where he got the 50% interest for the Debtors,

85

1    Lapides said that the Debtors refused to give Gonzalez the information, so he "guessed"

2    what it was "in order to fulfill my obligation to see if there was a conflict in the schedules

3    and the data."

4       242.   Lapides was then shown the Schedule K-1 forms for each of the members of

5    Canyon Meadows Investors LLC, reflecting their respective ownership interests in the

6    LLC. When asked to admit that the ownership interests added up to 100%, Lapides

7    responded "I don't know, I haven't done it." Lapides admitted there was a difference

8    between ownership of the LLC and the profits the LLC might make. After showing that

9    the percentage ownership of the LLC as listed on the K-1s added up to 100%, and that Jay

10   Johnson was not one of them, Lapides was asked to admit that if the K-1s were accurate,

11   then Jay Johnson would have no ownership interest in the LLC, and Lapides responded,

12   "absolutely not, that is false." Lapides admitted that the K-1s showed 100% interest in

13   members other than Jay Johnson for the year 1999 (the year of the exhibits), but that he

14   did not know what the ownership interests were thereafter. When asked if he was then

15   speculating about the subsequent years, Lapides said he did not know if he had the later

16   years or whether they were attached to his Report. Eventually Lapides admitted that if the

17   K-1s were accurate and truthful, those facts would indicate that Jay Johnson did not have

18   an ownership interest in the LLC. Lapides then argued that not having an ownership

19   interest did not mean Jay Johnson did not have an interest in the profits the LLC might

20   make (a fact that Jay Johnson never disputed). Asked if he had at any time seen anything

21   that indicated that the LLC had made any profits, he said "no." Not willing to face reality,

22   Lapides stated that even though the K-1s added up to 100% ownership in others, the "key"

23   document, the "partnership agreement" might show Jay Johnson having an ownership

24   interest in the LLC, and even though he had never seen the document and did not know

25   what it said he "suspected" it would show Jay Johnson having some interest. Lapides said

26   he guessed 50% in his Report because he did not know what it was: it could be 75% it

27   could be 80%, he did not know what it was, and when counsel suggested it could be zero,

28   Lapides responded "no."

**P.    The Fallbrook Property**

243.    Lapides testified Jay purchased twelve lots in Fallbrook, California for $3,252,000 cash. The Defendants accused the Debtors of failing to list the Fallbrook Property as an asset in the Bankruptcy Schedules. The Defendants had no evidence to support such an extravagant claim, and the evidence proved Jay did not purchase the property.

244.    The Vacant Land Purchase Agreement and Joint Escrow Instructions show the offer to purchase the property is from "Jay W. Johnson, Debra F. Johnson or assignee", signed by Jay and Debbie. The $20,000 deposit on the offer was made by Jay and Debbie. The seller made a counter offer, and Jay and Debbie made a counter offer, and LandAmerica Commonwealth issued a receipt for the $20,000 deposit.

245.    A Commercial Cover Sheet showed Jay and Debbie and JJ-AIA and 8000M, LLC as buyers of the property. A cover letter from the escrow officer and the Third Party Deposit Instructions sent with the letter indicate receipt of an additional $30,000 deposit coming from Steven F. Nelson to be used as a portion of the total cash required for the transaction.

246.    The Escrow Amendment/Supplement shows JJ-AIA assigning to 8000M, LLC "all interest in and to and all right to acquire title to the property which is the subject of this escrow", and "all funds now on deposit to the account of Buyer in this escrow," and JJ-AIA being released as buyer and 8000M, LLC agreeing to perform "as if it was the original party to the escrow instructions and Agreement in place of Buyer," and concluding that the property is to be vested in 8000M, LLC. Thereafter the escrow closed and the escrow, by cover letter addressed to 8000M, LLC in c/o Steven F. Nelson, sent the refund check in the amount of $51,588.54 and a settlement statement and HUD form to 8000M, LLC. The Buyers/Borrowers Closing Statement shows the buyer as 8000M, LLC, to be signed by Steven F. Nelson, Managing Member of 8000M, LLC. The Grant Deeds are signed by Steven F. Nelson as sole owner of 8000M, LLC.

87

247.   Every document shows the property being purchased by Steven F. Nelson's company, 8000M, LLC. There is nothing to connect the Debtors to any ownership interest in the company, and Lapides never inquired of Nelson or did any other research to determine if the Debtors had any interest in the company. It is obvious why Lapides stopped his investigation at this point—everything proves it is Nelson and his company buying the property, and any further evidence would only confirm the Debtors had no interest in the company.

**Q.     Q Financial**

248.   The Defendants alleged the Debtors were the true owners of Q Financial. The evidence regarding Q Financial can be summarized as follows:

> - Randy Johnson formed Q Financial in 1997, four years before the Debtors filed for bankruptcy.
> - Randy and Robin Johnson were the only owners or members of Q Financial; the Debtors were never owners or members of the company.
> - Q Financial's tax returns were signed by Randy, not Jay.
> - Q Financial's tax returns were prepared by Mike Milam, Randy's and his companies CPA, not by Sy or Swick, Jay's and his company's tax preparers.
> - The only money deposited into Q Financial's accounts was the $400,000 Randy invested and deposited in the company's Union Bank account, the $355,000 from the sale of Q Financial's stock in Ask Jeeves deposited into the Wells Fargo account, the $350,000 from the Frame 10 loan, borrowed by Randy, and the $85,000 transferred from JJ&A which were funds "due to" JJ&A and "due from" Q Financial.
> - No money from the Debtors or JJ-AIA was every traced into Q Financial's accounts.
> - Money from the sale of Q Financial's Ask Jeeves stock and some money from the Frame 10 loan was used by Randy for the downpayment on Randy's purchase of the La Forest Property.

88

1      ➢ With only a couple of exceptions when Randy's assistant "Molly" signed

2          checks, Randy signed all checks and made all transfers of funds into or out

3          of the Q Financial accounts, including the few checks issued to Lapides as

4          an advance of money to Jay to meet his obligations to Lapides under the

5          June 2000 Agreement.

6      ➢ Jay never wrote or signed a single check on the Q Financial accounts.

7      ➢ All checks from JJ&A to Q Financial (due from Q Financial transfers) were

8          signed by Randy; not a single check ever deposited to Q Financial from any

9          source was ever signed by Jay.

10     ➢ One check for $5,000 was issued by Q Financial, Randy's company, to

11         JJ&A, Randy's company, to meet a cash flow problem.

12     ➢ Lapides had no idea what kind of business Q Financial was engaged in, what

13         it produced or manufactured or what services it rendered, what investments

14         in made, who worked in the company, what they were paid—he knew

15         nothing about the company.

16      249.   In his Report Lapides identified Q Financial as one of the co-conspirators

17 defrauding the creditors of Jay and Debbie Johnson, including him. For purposes of this

18 action, it was admitted Q Financial was formed in March 1997, Randy and Robin Johnson

19 were the only members or owners of Q Financial, and Jay and Debbie Johnson had never

20 been owners of record of Q Financial. Lapides testified an LLC is a limited liability

21 company, but it was not important in this case to know what an LLC was or could or could

22 not do; it was only important to know that it is an "entity." Nonetheless, Lapides concluded

23 "Jay had some undisclosed interest in Q Financial and that he deposited money there to

24 hide it from detection." In answer to what kind of interest Jay had in Q Financial, Lapides

25 could only say money was coming out of Q Financial for Jay's benefit and he could not

26 identify any other kind of interest. Lapides had no idea what kind of business Q Financial

27 was engaged in or whether it produced or manufactured anything; nor did he know who

28 Q Financial employed. He knew nothing about the business and it did not matter to him.

**R.** **Lapides Changed His Testimony Regarding the Conspirators and Other Subjects**

250.   Obviously concerned with the accusations he made against people he called conspirators in the fraud he alleges was perpetrated upon him, Lapides back-pedaled as fast as he could at trial. Regarding several people, Lapides changed his testimony. Some of these people have lived through years of accusations of fraud and criminal activity and threats of investigation by the IRS, the U.S. Trustee's Office, and the Department of Justice, and eventual incarceration and a judgment for millions of dollars, only to now be told by Lapides that he does not know if they were the conspirators he was so sure of in the beginning. Of great significance is that each of the Plaintiffs must be treated individually, for example, Debbie and Robin had virtually nothing to do with the transactions complained about, and yet each was accused and pursued even though as to them there was absolutely no evidence of complicity. Even Lapides had to admit this at trial.

**1.** **Lapides testified it was not his opinion that Debbie Johnson had conspired to hide assets**

251.   In his Report, Lapides unequivocally states that "[a]s a result of the information secured from numerous third party sources, and the depositions of the debtors Jay and Debra Johnson, we [Lapides] were ultimately led to the conclusion that the debtors … conspired to conceal the debtor's cash, other assets, and owned real estate …." Lapides goes on to affirm that "[t]he individuals … involved in the conspiracy to defraud the bankruptcy creditors" include Debbie Johnson. Throughout his Report Lapides condemns Debbie Johnson equally with her husband in the fraud he so excruciatingly details as having been perpetrated upon him. For example, Lapides states: "As a result of the debtors, Jay and Debra Johnson conspiring with their co-conspirators," ownership of the Viro Road Property "was not reported in any of the BK schedules submitted, or on the debtor's tax returns." At another place, Lapides refers to Randy Johnson's testimony regarding JJ&A and concludes: "This testimony of Randal Johnson suggests that JJ&A was created as a

90

1    means to hide Jay Johnson's assets and to allow the debtors Jay & Debra Johnson to

2    defraud their creditors." That was the Defendants's mantra at the beginning and

3    throughout ten years of grueling litigation. At no time did any of the Defendants ever let

4    Debbie out of the case. Rather, they kept her in the case where she suffered all the invective

5    heaped upon the others just to put additional pressure on Jay to settle. Sensing he was on

6    thin ice and obviously concerned about the "evidence" in his Report, at trial Lapides

7    changed his opinion regarding Debbie's status as a conspirator. Incredibly, Lapides denied

8    that he ever accused Debbie Johnson of conspiring with Jay Johnson to hide assets from

9    Lapides, and further testified that it was not his opinion that Debbie had conspired to hide

10   assets. It was unconscionable for the Defendants to pursue Debbie knowing they had no

11   evidence to implicate her in the serious accusations of fraud on the bankruptcy court, the

12   trustee, and the creditors.

13           **2.     Lapides testified at trial that he did not have an accusation against**

14                **Robin Johnson for conspiring with the others**

15       252.   In his Report Lapides had no hesitation in identifying Robin Johnson as one

16   of the main conspirators against whom he wanted a judgment rendered. He directly

17   accused her of being involved in the conspiracy to hide the true ownership of the Viro

18   Road Property, the fraudulent transfer of the proceeds of the Sale of the Viro Road Property

19   by Michael McFall back to Robin and then the Debtors, the fraud involving MVM

20   Franchise Partners, and the fraud involving Lawrence Gillins and the Note to JJ&A. But

21   when asked at trial if he was accusing Robin of conspiracy, Lapides said he did not have

22   an accusation against her for conspiring and did not now know if she was involved. Like

23   Debbie, though, at no time did any of the Defendants ever let Robin out of the case. Rather,

24   they kept her in the case where she suffered all the invective heaped upon the others just

25   to put additional pressure on Randy to settle. As with Debbie, it was unconscionable for

26   the Defendants to pursue Robin knowing they had no evidence to implicate her in the

27   serious accusations of fraud on the bankruptcy court and the trustee and the creditors.

28

### 3. Lapides testified he does not know whether Michael McFall is a conspirator

253. Lapides makes abundantly clear in his Report that in his opinion Michael McFall was an integral and major player in the conspiracy to hide assets. Lapides begins his Report by stating that "[a]s a result of the information secured from numerous third party sources, and the depositions of the debtors Jay and Debra Johnson, we were ultimately led to the conclusion that the debtors ... and a close friend of the debtors (Michael E. McFall) conspired to conceal the debtor's cash, other assets, and owned real estate – including 4600 Viro Rd., ...." Lapides goes on to affirm that "[t]he individuals ... involved in the conspiracy to defraud the bankruptcy creditors" include McFall. After Jay and Randy Johnson, McFall is mentioned as a conspirator more than anyone else in the Lapides Report—literally scores of times. Lapides makes McFall an integral and principal player in the Viro Road Property transaction, the Circle Vista Property transaction, the MVM transaction, and almost every other transaction identified in the Lapides Report. The Report can hardly be opened at random without seeing McFall's name mentioned in connection with some alleged fraud. On the first day of trial, however, Lapides incredulously stated that he could not recall if he accused McFall of conspiracy and stated that he only found some "inconsistencies" between McFall activities and the bankruptcy which did not "correlate." Without the participation of McFall, however, much of the alleged fraud could not have taken place, so the Defendants left McFall in so the case would not collapse. If the fraud required McFall's participation, but there was no evidence of participation, then the case should not have been continued.

### 4. Lapides testified he does not know whether Greg and Elaine Litster are conspirators

254. At the beginning of his Report, Lapides names R. Gregory Litster (Robin Johnson's brother) and his wife, Elaine Litster, as "individuals ... involved in the conspiracy to defraud the bankruptcy creditors ...." Lapides testified at trial that he does

1   not know if the Litsters were aware of the fraud. If the Litsters were not aware of the fraud,

2   then that part of the fraud case collapses and the case should not have been continued.

3          **5.**    **Lapides testified he does not know whether Michael Milam is a**

4             **conspirator**

5      255.   At trial Lapides could not recall accusing Michael Milam of joining the

6   conspiracy. But without Milam, another part of the fraud is non-existent and the case

7   should not have continued.

8          **6.**    **Lapides testified he does not know whether Lawrence Gillins is a**

9             **conspirator**

10     256.   At trial Lapides testified that he came to no conclusion about whether

11  Lawrence Gillins was a conspirator. This was after he implicated Gillins in the hiding of

12  JJ&A's money. Without Gillins, another part of the fraud is non-existent and the case

13  should not have continued.

14     257.   The Defendants acted in bad faith, intentionally and maliciously instigating

15  and continuing the adversary proceedings against the Plaintiffs without any evidence to

16  prove the allegations in the proceedings, and knowing their conduct would result in the

17  damages sustained by the Plaintiffs. Accordingly, the Defendants acted with malice,

18  willfulness, fraud, and oppression, and in total disregard of the rights of the Plaintiffs;

19  because of such willful, malicious, fraudulent, and oppressive acts, an example should be

20  set, and the Defendants should be punished. Accordingly, the Plaintiffs are entitled to an

21  award for and hereby demand punitive or exemplary damages against the Defendants.

22

23

24     WHEREFORE, the plaintiffs pray for judgment as follows:

25

26  1.    For all costs and expenses, including attorneys' fees, incurred in defending

27       against Gonzalez I and II in the sum of $1.8 million;

28

COMPLAINT

2.  Damages for the emotional distress suffered by reason of the false allegations made against them in Gonzalez I and II and having to endure ten years of unjustified and bitter litigation;

3.  For punitive or exemplary damages;

4.  For costs of suit incurred herein;

5.  For reasonable attorneys' fees as permitted by law; and

6.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiffs hereby demand trial by jury.

Dated: May 19, 2017

*Burton V. McCullough*

Burton V. McCullough
Attorney for Jay W. Johnson, Debra F. Johnson,
Jay Johnson A.I.A. and Associates, Inc.,
Randal A. Johnson, Robin L. Johnson, JJ&A
Architects, Inc., and Q Financial Group, LLC

94